Judge Nichoi.as
cLlivcred the opinion of the court.
To an action on the case, brought by ■Gray against Combs, for killing a negro tnan slave, the latter plead in substance, that as clerk and store keeper, he had the care and custody of a brick ware-house, containing a variety of goods of great value, that before the killing said slave, some person having been in the habit of entering said Ware-house, at night, and stealing goods therefrom, though well secured with good doors and locks, and the defendant not being able to apprehend said thief, for the protection of said property and prevention of such stealing, set up a loaded gun on the inside of the1 house, with a string tied to the trigger; that said slave, in the dead hour of the night, witli the intent-of stealing said goods, broke and entered said house, pushed against said string, and thereby caused the gun to go off and himself to be shot and killed, &c. To this defence the plaintiff demurred, and the court having overruled the demurrer and given judgment for the defendant, the plaintiff prosecutes tiiis writ of error.
For the defendant, it is contended, that his act is only to he viewed in this suit, with an eye to the civil code, and the killing of the slave to be treated no otherwise than the killing of an ox under similar *479 diroumstances, anil that if lie has infringed any part of the criminal code, he must he left to a criminal prosecution for his punishment. This cannot be. If what lie has done is illegal, he is none the less responsible to remunerate the master for the value of the slave, because he may also lie responsible to the state for taking the life of a human being. His act, whether viewed civily or criminally, must be adjudged of in all its consequences, according to its legality, and it is perfectly immaterial whether the rule for testing its legality be found in the civil or the penal code. But conceding the distinction attempted, we should, by no means, be prepared to concede the consequence deduced from it. A similar process of reasoning would justify the destruction of human life, in the prevention of any mere trespass, by the use of like indirection in the mode of defence.
For the plaintiff it is contended, first, that the use of means calculated to produce death, by whatever indirection they may have been used, areas obnoxious to the censure of the law, and render the user as culpable, as if they had been used directly and immediately by himself.
Second, That the theft or robbery attempted by the slave, if perpetrated, would have been no felony, but only a misdemeanor, punishable by stripes alone.
Third, That the law does not allow the taking of human life, except for the necessary prevention of a crime, which, if committed, would be punished by the law, with death.
The first of these propositions may well be conceded. The second is undeniably correct. By the 19th section of an act of 1802, II. Dig. 1160, it is declared that a slave convicted of any other offence than murder, arson, rape, robbery from the person, and burglary, shall be sentenced to receive any number of lashes not exceeding thirty-nine. rI he third section of an act of 1806, Dig. 1161, declares in substance, that any offence in a slave, for which stripes are imposed as the only punishment, shall be deemed a misdemeanor only.
The ralo, as InU1 down by Sir William Blachbtime, Chai (he law wll not “suffer any crime to bo prevenfed by death, unless (he same, if committed, would be punished by death,” is incorrect.
In mo«t civilized countries (he uuIhoiizod ex tent of rpsirtanoe in the nece^nry dpftuce of the
In support of the third proposition, tve are referred to the language used by judge Blackstone on this subject, IV Com. 181 After citing the instances in which the law justifies killing to prevent the perpetration of various dimes, he alludes to another which he makes no doubt may be equally resisted bv (he death of the unnatural aggressor. “For, says lie, the one uniform principle that runs through our own and all other laws, seems to he this, that where a crime which in itself is capital, is endeavored to he committed by force, it is lawful to repel that force, by the death of the party attempting.” “The law of England, like that of every other well regulated community, is too tender of the public peace, too careful of the lives of the subjects, to suffer, with impunity, any crime to be prevented by death, unless the same, if committed, would also be punished by death.” If the law be as thus laid down, it is difficult, if not impossible to escape the conclusion, that the act of the defendant in this case, was illegal, and he consequently responsible for the value of the slave. For as the crime would not, if committed, have been punished with death, it would, according to this rule, have been unlawful to kill him.
But we cannot accede to the correctness of this rule, no authority is cited in support of it, and we believe none, sufficient to sustain it, can he found. Its recognition, would singularly and essentially curtail the right of self defence in this state, as here-, tofore supposed to he and long acted upon, with the approbation of all the virtue arid intelligence of the community. In such a community, where the rights of seif defence are so dearly cherished and so well maintained by the sentiments of our population, it would not merely be with reluctance, but extreme regret that we should acknowledge ourselves compelled to adopt or follow so restricted a rule. The result would be, in t.he present state < f our criminal code, that neither highway robbery, rape, or a variety of other equally atlrocious crimes could be lawfully prevented by the death of the aggressor. Indeed, we apprehend that it would l>£ as futile, as unwise, for even the legislature to an *481 nounce such a rule. Public sentiment is so deeidedy an.I unalterably opposed to it, that it would be vain to attempt ils enforcement. In vain would the way-fairer be directed to surrender his horse and his purse to a robber, rather than protect them by the death of the assailant. In vain would juries he called on to punish with the gallows, « necessary defence of female chastitv. W© fear not the imputation of temerity, in hazarding the opinion, that Blackstone has misconceived both the rule and the reason of it. In every civilized community except where there prevails such a draconic code as exists in England, the authorized extent of resistance in the necessary defence of the person or property against the perpetration of crimes, must greatly exceed the amount of punishment prescribed bv law for their perpetration. The final sanctions of all wise codes are framed in a spirit of true clemency, and with a view rather to deter from the commission and repetition of crime, than thoroughly to avenge an injury done. Much of the punishment is left to the conscience of the criminal, and to th© ultimate avenger of all human crime. On the other hand, the right of necessary defence, in the proteo tion of a man’s person or property, is derived to him from the law of nature, and should never be unnecessarily restrained by municipal regulation. However proper it may be for every well ordered community to be tender of the public peace, and careful of the lives of its citizens, there can be neither policy or propriety in extending this tenderness and care so far as to protect the robber, the burglar and the nocturnal thief, by an unnecessary restraint of the honest citizen’s natural right of self defence. Sir Matthew Hale, in speaking on this subject, says, “the right of self defence in these cases is founded in the law of nature, and is not, nor can be super-ceded by the law of society. Before societies were formed, the right of self defence resided in individuals, and since, in cases of necessity, individuals incorporated into society, cannot resort for protection to the law of society, that law with great propriety and strict justice cousidereth them as still, in that instance, under the protection of the ¿aw of nature.’’
And if a slave break and enter such n-a-.bouse in t-o night time with intent to steal, and is mortally shot bv such spring >:m>, the owner of th*i warehouse, who treated the spring gun is n *t rest onnblo for the y -luo Oí ti.'Q slave. person or pr i- ■ erty against the perpetration of crimes must gre-.tJy excee'i the amount of 1‘unislimcnt presenter! by! law for their perpetration.
*482 Indeed Blackstone himself, IV Com. 180, holds this language, “Such homicide as is committed for the prevention of any forcible and atrocious crime, is justifiable by the law of nature, and also by the law of England, as it stood so early as the time of Bracton, and as it is since declared in statute, XXIV Hen 8 c. 5.” He then cites the Jewish law, which punidles no theft with death, yet justifies homicide in cases of nocturnal house breaking. “If a thief be found breaking up and he be smitten that he die, no blood shall be shed for him, but if the sun be risen there shall blood be shed for him.” He then cites the law of Athens, whereif any theft was committed bv night, if was lawful to I, ill the criminal if taken in the fact, and the transcription of the same law into the Roman twelve tables, and concludes thus, “which amounts very nearly to the same, as is permitted by our own constitutions.” Without attempting to reconcile this language with that first quoted, an apology may be found for the latter, in the fact that almost every forcible and atrocious .'crime is punished with death, hy the laws of England, so that the rule as laid down by Blackstone may there be strictly correct in its letter, though not in its spirit or for the reason assigned by him.
We have not had access to Bracton, to see the citation made from him by Blackstone, but have met with the following quotation from him in a note to Hale, 488. Qui latronem Occident, noclurnum vel diuiurnum, non tenelur. si alilerpericulum evaden non possit lenelum tamen siposdt.
It is evident'froin the language used hy Hale, P. C. 484 to 489, that he placed justifiable homicide upon the ground of the prevention of a felony and not the prevention of a crime punished hy death. After stating a case of justifiable homicide in defence of a third person, he says, “and the reason seems to be because every man is bound to use all possible lawful means to prevent a felony.” Again — “In case of a felony attempted, as well as of a felony committed, every man is thus far an officer, that at least in killing the attempter in case of necessity, puts him in the condition of se defendendo, in defending his neighbor.” — ‘“now concerning felonies, as there- *483 is a difference between them and trespasses, so there is a difference among themselves, in relation to the point of -se defendendo. If a man come to- take my goods as a trespasser, I may justify the beating him in defence of my goods, but if I kill him it is manslaughter. But if a man come to rob me or take my goods as a felon, and in resisting I kill him, it is me dejettdendo at least,, and in some cases not so much.”
He further says that the statute, XXIV Hen. S c ■5, was but declarative of the-law as it stood before, and to remove a doubt, and puts the killing a robber in or near a highway, &>:. in the same condition with one that intends to rob or murder in the dwelling house, and exempts both from forfeiture.
Foster, p. 273, says, ua party may repel force by force, in defence of his person, habitation, or property, against one who*manifestly intendeth andendeavoreth, by violence or surprise, to commit a known felony on either.”
From these authorities, and what we deem to be the reason of the law, it would seem, that the right-of killing to prevent the perpetration of crime, depends more upon the character of the crime, and* the time and manner of its attempted perpetration, than upon the degree of punishment attached to it by law, or upon the tact oi its being designated ia the penal code as a felony or not. A- name canineither add to, or detract from, the moral qualitiesof a. crime, and in the eye of reason and justice, the intrinsic nature of tiie offence, together with the time and manner of its attempted commission, must ever test the legality of the means to be resorted to for its prevention. It is not absolutely necessary, however, for the purposes of .this case, to-do more than place it on the ground of the prevention of a felony. For, though the robbery attempted in this case would only have been a misdemeanor in a slave, yet, in a white person, it would have been a felony; and, therefore, though according to strict law, it may not have been a justifiable means of prevention as against a slave, such being known to be the character of the thief, yet, in the absence of such know *484 ledge, wc would suppose a resort to such means justifiable, as is permitted against the general, more numerous and worthier class of the community, and the circumstance of the calamity lighting upon one of the other class, is to be taken as misadventure. Whatever cavils may lie entertained against such a course of reasoning, we should feel little hesitation in resorting to it, if necessary, to render slaves liable to all the same perils that whites incur in nocturnal depredations, and justifying as against them the same means of defence as against whites. The crime is of the same moral die in each, and neither justice or policy would allow the inculpation of a resort to the necessary means of prevention against its perpetration by one, and not by the other, merely from the circumstance that the offence when committed by one, is designated in our code by a different name, than when committed Ly the other.
!flie right of self clo'enee is not fieri v orl from society, but is a right which every in dividan) bri1 gs with him into S'— ciely, and >etaios in soor- - ty, except so far a= the laws of society h.ivc curt'aijed it..
The right of punishing crimes, and the infraction of individual rights, may well be presumed to be surrendered bv every man to the whole community, when he enters into civil society. The well being of society requires it. Not so, however, as to the right of defence. Its possession and exercise are still necessary to individual security, and not incompatible with the public good. It is true society may curtail this right, and no doubt does restrain its exercise in many important particulars. But it is emphatically a right brought by the individual with him into society, and not derived from it. He consequently retains the plenary right, except so far as it has been restrained by the laws of society. The extent of the right of defence is necessarily undefined by the law of nature. Its only limit is necessity. “ That law,” says Rutherforth, “allows us to defend our persons or property, and such a general allowance implies, that no particular means of defence are prescribed to us. Whatever means are necessary, must he lawful, because it would be absurd to suppose that the law of nature allows of defence, and yet foibids us, at the same time, to do what is necessary for this purpose. It follows, that he who attempts to injure us, gives us an indefinite right over his person, or a right to make use *485 of such means to prevent the injury, ns his.behavior ami our situation 'make necessary.” He also says— “ the right of defending our goods is an indefinite one, and that we arc not naturally debarred from proceeding to extremities in their defence, where the obstinate injustice of those who would deprive us of them renders this necessary.” The same author also vindicates such defence of our goods as may end in the death of him who attempts to take them from us, as consistent not merely with justice, but with benevolence also. This, however, is a question for casuists. It is one with,which we have little to do. Our inquiry is limited to ascertaining, whether our municipal code has restrained the natural right of defence so far as to inhibit what the defendant lias done in- tin’s case. We cannot find that it has. So far as we know, there has been no authoritative precedent for so saying. We are not at all disposed to make such a precedent.
Where n prrfoil ha3 v ■ Íuble.propcrty in a «Irons; waro-hons", well secured by looks and doors, it is lawful for him, as an íul-¡ dinonal security at night, to erect a spring gun which can only be made to explode hv entering (be
It is not necessary in this case, nor shall we, therefore, attempt the difficult and delicate task of defining how far, and in what instances, the law of society has restrained the right of defence for the security of the lives of our citizens from the wanton cruelty arrd guileful malice of those who might otherwise indulge their evil passions under the guise of protecting property. We shall content otirselvcs with saying the restraint does not, and.should not, extend to this case. That where a person has vain-able property in a strong warehouse, well.secured by locks anti doors, that he may, as an- additional security at night, erect a spring gun which can only he made to explode by entering the house. That the defence used by the defendant was, thorefoje, lawftd, and the calamity which ensued, ascribable to the slave’s own act. We know of no process by which the defendant could have obtained (lie protection of the law against an unknown tliief. The law did not require him to hire a guard for its protection. Neither was he hound to leave it to the spoliation of nocturnal depredators. The time and circumstances constituted a case of necessity that legitimated the means resorted to.
*486 Tliis conclusion is sustained by the respectable atrthority of Rntherforth, in his Institute-.-, 306. “Some injuries of a lower order,” says he, “though not irreparable in their own nature, are so by accident. There is the same reason why a man should be at liberty to delend himself against these, as there is, why he should be at liberty to defend himself against those of higher order, where he can have no assistance from civil jurisdiction. Of this sort we may reckon the loss of goods, where the person who attempts to steal them is unknown or where, though he is known, there is amoral certainty that the public can never interpose, so as to obtain tiie restitution of them. The rules that, ought to be observed in these circumstances, are the same as ought to be observed in a stale of nature. And where the law of nature would justify a man, considered as an individual, in proceeding to extremities, the same law will justify him in taking the same measures, though he is a member of society.” Meaning of course, as we presume, except so far as restrained by the ordinances of society. As befóte stated, we know of no law restraining the right as exercised in this case.
We have been unable to find any case in which this question has come before any of the courts in America, or any English court, prior to the revolution. But in the case of Halt vs. Wilkes, Iff B. and A. 304, it was decided by the court of King’s Bench, that a person might lawfully place loaded spring guns in enclosed grounds to prevent depredations ; and the plaintiff in that case who had received severe bodily injury, whilst gathering nuts, from a gun so placed, was non-suited. It is true, the plaintiff had notice of the gun’s being in the woods, hut that seems not to have been treated as a controlling circumstance, for it is conceded by the court, that if the setting of the guns had been unlawful, notice to the plaintiff would not have exempted the defendant from liability- We are not called on now to give our dissent or assent to the principle ruled in this case, but mention it for the double purpose of shewing the extent to which such means have been permitted in England for the protection of property,' and of authorizing a suggestion of tue propriety of legisla *487 live interposition, for the restraining within due and proper hounds the exercise of any such right. The determination in Wilkes vs Halt was, no doubt, the occasion of the passing of the act of the British Parliament, VII and VIII Geo. 4 e. T8, which declares, “ that if any person shall set or place, or cause to he set or placed, any spring gun, man-trap, or other engine calculated to destroy human life or inflict grevious bodily harm, with the intent that the same, or whereby the same, may destroy or inflict previous bodily harm upon a trespasser or other person coming in contact therewith, the person so setting or placing, or causing to be set or placed, such gnu, trap or engine as aforesaid, shall be guilty of a misdemeanor. Provided, that nothing in this act shall he deemed to make a misdemeanor within the meaning thereof, to set or cause to he set, from sunset to sunrise, any spring gun, mim trap or other engine, which shall he set in a dwelling house for the protection thereof.”
•ftforehead and Broten for plaintiff; Crittenden ancT Monroe, for defendant.
The judnment must be affirmed, with costs.