## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ERRORS

#### OF THE

# STATE OF CONNECTICUT.

---

JOHNSON *against* PATTERSON:

#### IN ERROR.

Where the defendant, to prevent the plaintiff's fowls from trespassing upon his land, as they had before done, mixed *Indian* meal with arsenic, and spread it upon his land, having given the plaintiff previous notice that he should do so; and such fowls, coming afterwards upon the defendant's land, ate the poisoned meal, in consequence of which some of them died; it was held, 1. that previous notice, in contradistinction to notice after the fact, was sufficient; 2. that notwithstanding such notice, the defendant was not justified in the use of deadly means, and consequently, was liable in damages.

THE original action was trespass, brought by *Henry Patterson* against *Sheldon C. Johnson*, to the county court of *New-Haven* county, for killing and destroying ten hens and chickens, the property of the plaintiff. There was also a special count in *case*, for the same injury.

On the trial before the county court, *November* term, 1839, the plaintiff offered evidence to prove, and claimed to have proved, the allegations in his declaration. The defendant claimed to have proved, by proper evidence introduced for that purpose, that he had been, for a long time, trespassed upon, by the plaintiff's fowls coming upon his land and destroying the seeds therein planted, and the vegetation thereon

1

growing: that to prevent a repetition and continuation of these trespasses, he prepared *Indian* meal, mixed with arsenic, and scattered it upon his land, having first informed the plaintiff, that such a preparation would be placed there, and that the plaintiff must confine his fowls, or in some other way prevent them from trespassing upon his land again, otherwise they certainly would be poisoned : that after such notice, the meal so prepared was immediately scattered on the defendant's land ; and the plaintiff still neglecting to confine his fowls, or to prevent their coming upon the defendant's premises, they trespassed thereon, and while so trespassing, ate the *Indian* meal so prepared, and some of them thereafter died in consequence of it; which, the defendant claimed, was the same injury for which the plaintiff sought to recover damages.   And the defendant claimed, that if these facts were satisfactorily proved, he was justified ; and that the court should so charge the jury.   The defendant further claimed, that he might lawfully scatter poisoned meal upon his own premises, without any notice to the plaintiff.

The court charged the jury, that unless the defendant had given full and ample notice to the plaintiff, after the poisoned meal had been laid, the defendant could not be justified ; and that no previous notice of his intention so to prepare and leave the poisoned meal, could be sufficient ; and refused to charge the jury, that the defendant had a right to scatter it, without notice.

The jury returned a verdict for the plaintiff.   The defendant filed a bill of exceptions to the charge, and thereupon brought a writ of error in the superior court ; which was reserved for the consideration and advice of this court.

*C. A. Ingersoll* and *Blackman,* for the plaintiff in error, contended, 1. That no person can lay the foundation of an action for damages in case, for an injury to his property, by a wrong on his part, or by neglect or breach of duty.   To entitle a plaintiff, in an action of this sort, to recover, he must be free from fault.   1 *Sw. Dig.* 551. 553.   *Wadhurst* v. *Damme, Cro. Jac.* 45.   *Blyth* v. *Topham, Id.* 158, 9.   *Brock v. Copeland,* 1 *Esp. Rep.* 203.   *Butterfield* v. *Forrester,* 11 *East* 60.   *Burckle* & al. v. *New-York Dry-Dock Company,* 2 *Hall* 151.   *Bush* v. *Brainard,* 1 *Cowen,* 78.   *Rathbun* & al.

New-Haven,
July, 1840.

Johnson
v.
Patterson.

v. *Payne* & al. 19 *Wend.* 399. *Deane* v. *Clayton*, 7 *Taun.* 489. *Ilott* v. *Wilkes*, 3 *Barn. & Ald.* 304. *Sarch* v. *Blackburn*, 4 *Carr. & P.* 297. *Curtis* v. *Mills*, 5 *Carr. & P.* 489.

2. That the plaintiff was in fault in permitting his fowls to trespass on the defendant's land, after the notice given.

3. That the defendant had a right to protect his property, by the acts, which, it is claimed, were done. *Mahan* v. *Brown*, 13 *Wend.* 261. This case is not like that of *Townsend* v. *Wathen*, 9 *East* 277.

4. That the charge was not as it should have been, on another ground. In some cases, the defendant would have a right directly to *kill* the plaintiff's animals trespassing, if the killing was *necessary* to protect his property. *White* v. *Ward & al.* 9 *Johns. Rep.* 232. *Vere* v. Lord *Cawdor* & al., 11 *East* 568. *Wadhurst* v. *Damme, Cro. Jac.* 45. If the same principles are to be applied to the killing by means of the poisoned meal, as would be applied to a direct killing, the charge was wrong ; as, in such a case, the defendant would have a right, *if necessary*, of which necessity the jury are to judge ; and this should have been submitted to them.

*C. B. Phelps*, for the defendant in error, contended, 1. That the maxim *Sic utere tuo ut alienum non lædas*, was applicable to and governed the present case. *Townsend* v. *Wathen*, 9 *East* 277. *Dean* v. *Clayton*, 2 *Marsh.* 577. S. C. 7 *Taun.* 489.

2. That the facts proved by the original defendant, did not constitute a justification. The poisoned meal afforded no remedy for past injury, and was not a preventive of present aggression. It could only operate as a preventive of future mischief, by the destruction of the instruments of its accomplishment. But the poisoning of animals is a public offence, and involves the infraction of a private right. *Commonwealth* v. *Leach* & al. 1 *Mass. Rep.* 58. 2 *Russell*, 1682. n.

3. That the charge was unexceptionable with regard to *notice*. A *prospective* notice would be nugatory—a forewarning of possible evil—a mere threat. Notice *after* the fact shews the presence of actual danger.

SHERMAN, J. This is not a case in which the destruction of the plaintiff's property resulted from acts done by the de-

fendant, in the ordinary use of his own, without any intention to do the injury complained of; as in *Blythe* v. *Topham, Cro. Jac.* 158. where a stray horse fell into a pit made by the defendant in the common ; or in *Bush* v. *Brainard,* 1 *Cowen,* 78. where the cow of the plaintiff, trespassing on the defendant's land, was killed, by drinking maple syrup in the defendant's sugar works.   In this case, the defendant scattered the poison in his enclosure with intent to kill the plaintiff's fowls, if they should again trespass on the place.   Being of opinion that the notice given by the defendant immediately before the poisonous article was put on the land, was sufficient, the only important question is, whether the defendant, having given such notice, offered in evidence a sufficient justification.   If the jury have found the verdict, which they ought ultimately to give, the final judgment must be affirmed, although the court erred in regard to the sufficiency of the notice.

By the settled principles of the *English* law, the degree of force, which may be employed in defending one's person or property, when present, is well defined, and admits of no controversy.   It is entirely and exclusively *defensive.*   If a man makes an assault on the person of another ; or enters his house and refuses to go out, when ordered; or enters on his land ; or in any way attempts a mere trespass on his property real or personal, by force; so much force as is necessary to to repel or prevent injury, or remove the trespasser, may be employed.   There is no doubt, that if *A* is trespassing on the land of *B,* the latter, when present, by himself or his servants, may, after notice to depart, use such reasonable force as is necessary for his removal.   He may use like force to expel another's beast from his land, or he may seize and impound it.   But he has no right, by the *English* law or our own, when present, in such a case, to destroy life, or inflict permanent injury, or use greater force than is necessary for removal or prevention.   This is admitted.   The right to kill a bull or other furious beast from which one's person is in present danger ; or a dog chasing sheep or other animals of property, so that they are exposed to harm ; or a dog seen at large, which is accustomed to bite mankind ; is an exception to this rule. *Wadhurst* v. *Damme, Cro. Jac.* 45.   1 *Saund.* 84. note (3.) *Leonard* v. *Williams,* 9 *Johns. Rep.* 233.   *Putnam* v. *Payne,* 13 *Johns. Rep.* 312.   1 *Freem.* 347.

But in *England*, it has long been usual for the proprietor <span style="float:right">*New-Haven,* July, 1840.</span> of land to place spring-guns and other deadly engines upon an enclosure, so concealed as not to be seen, to wound, kill or destroy any man or animal that comes upon the place; and it is there held, that if proper notice be given, he is justified in inflicting any injury on men or animals, trespassing on the grounds, even to the taking of life. Thus, in the case of *Ilott* v. *Wilkes*, 3 *Barn. & Ald.* 304. decided in 1820, the plaintiff was gathering nuts on the wood land of the defendant, upon which nine or ten spring-guns were concealed, and was wounded in consequence of treading on a wire, communicating with a loaded spring-gun. He had notice that these guns were set in the wood. The court held the defendant justified, and judgment was given in his favour. It was admitted, that, in such a case, if the defendant had been present, he could not have used a dangerous weapon, nor have inflicted any wound upon the plaintiff. It was said, by *Best*, J., that although one could not, without pain, decide against the action, where the injury suffered by the plaintiff was extremely severe, yet we must not allow our feelings to induce us to lose sight of the principles which are essential to the rights of property. The prevention of intrusion upon property is one of those rights; and every proprietor is allowed to use the force which is *absolutely* necessary to vindicate it. If he uses more, said he, than is *absolutely* necessary, he renders himself responsible for all the consequences of the excess. But it was held, that when the owner is absent, resort to these severe measures becomes necessary; that although it be a maxim of law, that a man cannot do that indirectly which he cannot do directly, yet that was not applicable; "for," says Justice *Holroyd*, "where the plaintiff had express notice that the spring-guns were placed on the premises into which he wrongfully entered, the act of firing off the gun, which was the cause of the injury, was *his act*, and not the act of the person who placed the gun there." (*P.* 300. *Amer.* ed.)

<span style="float:right">Johnson v. Patterson.</span>

This is a summary of the principles applied, by the *English* jurists, in support of the rule as held in that country.

In *Connecticut*, this question has not, to our knowledge, been decided. It is certainly of very great importance. Upon the principles adopted in *England*, no distinction is made between the various kinds of property, which a party

may injure or destroy, by spring-guns or other similar devices. If the fowls in question may be shot or poisoned, so may horses, oxen and other valuable animals, which will sometimes stray into a neighbour's field, notwithstanding the prudent vigilance of their owner. Indeed, the rule expressly authorizes not only the destruction of all kinds of animals, but of human life. Our people, hitherto, have never, by their usages, acknowledged this to be the common law of the state; and its adoption, in its full extent, would tend to impair the moral sense, and that tender regard for the lives and property of others, for which they are distinguished, and which ought to be cherished, as essential to the virtue and harmony of society. Whoever has examined the *English* common law upon this subject, must be satisfied, that its origin has been aristocratic and feudal, and the offspring of the peculiar state of society, which existed three centuries ago. 2 *Blk. Com.* 417. It arose from the same spirit, and is part of the same system, as their game laws, which have long been considered, by many of their soundest jurists, as an anomaly in their admirable system of municipal jurisprudence. Mr. Justice *Willes* says, " nothing can be more oppressive than the present system of the game laws ;" (1 *Term Rep.* 49.) and *Blackstone,* speaking of the same subject, says, " yet, however defensible these provisions in general may be, on the footing of reason, or justice, or civil policy, we must notwithstanding acknowledge, that, in their present shape, they owe their immediate origin to *slavery.*" The various statutes, enacted from time to time, relative to the qualifications for killing game, from the 1 *Rich.* 2, the first in the series, which prohibited every man, not having lands or tenements of the value of forty shillings a year, from keeping any hound or other dog, to hunt ; or any engines to take or destroy " hares, conies or other *gentlemen's game,*" on pain of a year's imprisonment, enacted in 1393, down to the 22 *Char.* 2, which raised the requisite qualification to 100*l.* a year, are all of the same spirit. They deprived every unqualified person of the right to hunt, even on his own land. At a still earlier period, the protection of the forests, and of the privilege of hunting, by the king and nobility, was an object of such interest, that trespassers on the king's forests were punishable with death, and by putting out their eyes and other bodily tortures. From this the law in

question had its origin ; and although the charter of forests,
granted in the reign of *Henry III.* abolished the punishment
of death for offences in forests, yet the common law permit-
ting individuals to inflict death, by spring-guns and other
deadly means, is still in operation. In the case already cited,
Justice *Best,* who considered the plaintiff as justly shot for the
harmless liberty he had taken to gather nuts in a forest, ex-
pressly urges in support of his opinion, the importance of pro-
tecting the *hunting grounds.* He speaks of it as interwoven
with the highest interests of the nation. "Much money,"
says he, (page 300.) "is expended in the protection of game ;
and it would be hard, if, in one night, when the keepers are
absent, a gang of poachers might destroy what has been kept
at so much cost. If you do not allow men of landed estates
to *preserve their game,* you will not prevail on them to reside
in the country. Their poor neighbours will thus lose their
protection and kind offices ; and the government, the support
that it derives from an independent, enlightened and unpaid
magistracy." How different is the state of society in *Con-
necticut!* Is there here any danger that great landholders
will retire from the country ; or that the poor will lose pro-
tection, or the state its magistracy, unless men are indulged
in the use of deadly engines for the protection of game ? Ex-
cept for these grand considerations of public policy, on which
this right of protecting property is grounded, it would never
have had existence, by the law of that country ; and, happily,
they are utterly inapplicable to this.

But we will consider, more particularly, some of the chief
grounds on which this severe rule is held, in the *English*
courts, to be sustained by legal principles.

It is said to be "absolutely necessary for the protection of
property in the absence of the owner."

If this be true at all, it must be in relation to that kind of
property only, which, in *England,* is the chief object of this
sort of protection. It has never been adopted in this state ;
and the ordinary protection of fences as required by statute,
and redress by impounding and suits at law, have been found
sufficiently effectual for almost every sort of intrusion on real
estate. In this very case, an action for damages would prob-
ably have prevented trespasses in future. But if further
provision is necessary in regard to winged animals, and others

Johnson
*v.*
Patterson.

which fences cannot restrain, and whose owners cannot easily be ascertained, it had better be made by the legislature, and limited to the exigencies which require it.    The *English* rule, if recognized as the law of this state, must be extended to every case which falls within its principles, and cannot be limited, by the court, in its application.

That a man shall not do indirectly what he cannot do directly, is an acknowledged maxim of the *English* law and of our own.    The reasoning which excludes its application to this case, is very inconclusive.    The argument is, that the trespasser, having full knowledge of the danger, goes into it voluntarily, and personally inflicts the injury on himself.    It is not done, even indirectly, by the owner of the enclosure.

So far as this applies to taking human life, it proves too much.    The man who should furnish suicides with the means of self-destruction, would justly be considered as partaking of the crime of homicide, however voluntarily or rashly they were bent on its perpetration.    To prevent the commission of a *felony*, the law of necessity applies ; and on that ground, a man, in such a case, may, when present, justify personal violence, which would not be admissible, in the case of a simple trespass.    The argument admits this, but attempts to make a distinction, on the ground, that he is not the agent who sets the spring-gun, but he who fires it off.

But what is the agency of the trespasser, in such a case ? Does he *voluntarily* pull the wire of the spring-gun ?    Is it his intention to be shot ?    This question must be answered in the negative.    It must be admitted, that his intention is to commit a simple trespass only, and he will, if possible, avoid the injury to which he is exposed.    So far as his intentions are concerned, the discharge of the gun is accidental and against his will.    He knew, indeed, that, by his own act, he was exposing himself to death ; but that catastrophe he meant, if possible, to avoid.    But what was his intention who set the gun ?    It was to subject the trespasser to whatever injury he might suffer, if he trod on the wire.    Here is an agency accompanied with intention; and that intention is accomplished, if the event happens.    This transaction, in the *English* view of it, does not differ from one which is admitted to be illegal. The owner of a hundred-acre field gives notice, that he shall be there, at a given time, with a loaded gun, and shall fire on

New-Haven,
July, 1840.

Johnson
v.
Patterson.

any trespasser, who shall enter his lot.    The threat is executed.    The trespasser entered in his own wrong, with full knowledge of his danger, but in hopes of avoiding injury.    In both cases, what the trespasser does, is intended.    In neither, has he any design to inflict injury on himself.    His will has no more agency in discharging the gun, in one case than in the other.    In both, the owner intended what took place, and voluntarily arranged the necessary means for its accomplishment.    If *A* sets a spring-gun in his field, where his neighbour has a right of way, and the latter, with full notice, passes and receives a wound, it is admitted, that *A* is liable; but it is contended, that in the former case, the trespasser was *in the wrong*; but in the latter, the neighbour had a right to be upon the land.    But the question is not, which was in the wrong, but which did the act.    The agency, and the guilt of trespassing, are distinct things.    He who set the gun and he who sprang it, had, respectively, the same agency in each case; and if that alone will excuse, in one case, it will in the other.    If the guilt of the sufferer is alleged as justifying the act, in one case, then let that be the test in both.    With that test we shall excuse the man who was travelling on his own right of way, and condemn the trespasser: but we shall not be embarrassed with the idle distinction between the agency of the sufferer, in the one case and in the other.    The plain inquiry will be, whether the acknowledged wrong of the trespasser was such as authorized the infliction of the injury; and if it did not, we shall attribute the act of discharging the gun to him who placed it there for that purpose, and judge of his responsibility accordingly.    Now, it is fully admitted, by every *English* jurist, that the act of the trespasser does not authorize the infliction of the injury, by the hand of the owner of the land, when present, on either man or beast.    But the *guilt* of trespassing on the land, is no greater in the absence of the owner, than when he is present.    Its character, in the eye of the law, is that of a trespass only, and not a crime, in either case.    If the guilt is not such as justified the injury, how is the justification strengthened, by the manner of inflicting it?    But in order to vindicate the means long used by land-holders for the protection of game, and shew their consistency with legal principles, the *English* judges have adopted theories, which are exceedingly refined.    If *A* stands by, while the

trespasser treads on the wire, although he does nothing, he will be liable for the damage, because the act is his own. But if he leaves the place, after having arranged the machinery, fully intending to effect the same injury, and the trespasser is shot, in the same way, they say it is not the act of *A*, but that of the trespasser, and *A* is innocent. In this case, if the defendant, after scattering the poisoned meal, had returned to his garden, and seen the fowls devouring it, the act, as is admitted, would be his own, and he would be subjected in this suit, unless he did all in his power to prevent the injury ; and the only ground on which his justification can be placed, is, that he left the meal, and it was eaten in his absence. Had he been present, *he* would have poisoned the fowls ; but as he was not present, it was the act of the plaintiff. The opinion of Mr. Justice *Holroyd* explicitly presents this distinction. He says, that " if the defendant had been present, and had seen a trespasser enter, and had the means of preventing the injury, and had not done all in his power to prevent it, *unquestionably* it might have been considered as proceeding from his own act ; but, in the present case, he was absent, and had not the means of averting the mischief ; and, *therefore*, the maxim of law, that a man cannot do indirectly what he cannot do directly, is not applicable to the present case." (*P.* 301, *Amer.* ed.) This seems to involve the proposition, that a man is responsible for not guarding against the *intended* consequences of his own *innocent* act ; and, if he does not, that shall be considered as his own act, which is the act of another.

Much stress is laid, by the *English* judges, in various cases, upon the argument, that the trespasser incurs the evil which he suffers, by entering or permitting his creatures to enter on another's land, with full knowledge of the impending injury ; and of course, must attribute the consequences to his own voluntary act. Whatever he suffers, be it death itself, is of his own procurement.

Were this reasoning sound, it would supersede the necessity of complicated codes of criminal law. The punishment of death might justly be inflicted for every offence. The offender can always avoid the punishment, if he pleases ; for no man is punished but for *voluntary* violations of known law. Such a code would be, on some accounts, more tolerable

*New-Haven,*
July, 1840.

Johnson
*v.*
Patterson.

than the law in question.    This warrants death for a mere
trespass; that for crimes only.    There, the trial is by a jury
of men; here, death is inflicted without the interposition of
any intelligent being.    The malignant poacher and the poor
insane wanderer are equally liable to become the victims.

It has been assumed, in the preceding remarks, that the
common law of *England* is in favour of the right of the de-
fendant to take the measures which he did to protect his land
from the plaintiff's fowls.    It is true, that spring-guns and
other destructive means have been immemorially used in that
country.    The particular grounds, however, upon which this
assumption is made, are of very recent origin.    It was never
decided, by their courts, that the proprietor of land could vin-
dicate himself for any injury to the person or property of
another, by means of dangerous engines, until 1820, in the
recent case of *Ilott* v. *Wilkes*, already cited.    Three years
before, the same question was agitated in the court of *Com-
mon Pleas*, and very elaborately debated, in *Deane* v. *Clay-
ton*, 7 *Taun.* 489.    That action was for the loss of the plain-
tiff's dog, which was killed, by running against a dog-spear,
while chasing a hare, on the defendant's land.    The spear was
fixed to a tree, to destroy dogs and foxes, and protect the
game.    After great deliberation the judges were equally divi-
ded in opinion on the general question, as well as on some
minor points involved in the case.    In the course of those
discussions, the learned counsel and judges thoroughly exam-
ined the authorities; and, although they derived arguments
and inferences from decided cases, yet the main question was
on all hands admitted to be new.    As the court was equally
divided, no judgment was rendered.    The unanimous opinion
of the *King's Bench* in the case of *Ilott* v. *Wilkes*, is of bind-
ing authority in that kingdom.    Except for the preservation
of game, such engines appear to be little used in that country,
and, for the same purpose, would be of no use in this.    The
opinions of those judges, who held that the law will not justify
a man in causing injuries by such means, which he cannot in-
flict directly, with his own hands, are sustained by the settled
principles of the common law.

We cannot justify the defendant in committing the com-
paratively small trespass for which the plaintiff complains,
upon any principles which have been admitted in this state,

or which we can reconcile with those just provisions of the *English* common law, which we have already incorporated into our own, in regard to the means which may be used to prevent a simple trespass. The case does not involve the inquiry, what may lawfully be done to prevent a burglary or other felony. Cases of that character are governed by other and well settled rules.

We advise that the judgment of the county court be affirmed.

In this opinion the other Judges concurred.

Judgment affirmed.