### 44313. BISHOP v. THE STATE.
(356 SE2d 503)

GREGORY, Justice.

Robert C. Bishop was convicted of malice murder and sentenced

to life imprisonment.[1] We affirm.

Bishop lived in a trailer park in Coweta County. Because he was concerned about past break-ins to his trailer, he erected a spring gun or trap gun. He positioned a Mauser 8mm high-powered rifle on two chairs with the barrel pointed in the direction of the trailer's front door. A string attached to the door knob ran over the back of one of the chairs and was connected to the trigger.

Bishop went to work on the night of February 13, 1986 with the spring gun in place. Later, James Freeman, an acquaintance of Bishop, attempted to enter the front door of the trailer. The rifle discharged and hit the metal molding at the foot of the door. Freeman was hit by either a ricocheting bullet fragment or a piece of flying metal. Neighbors heard the shot and found Freeman lying wounded in Bishop's driveway. The neighbors said the trailer was dark, but that Bishop's car was in the driveway.

Freeman was taken to a Newnan hospital. The doctor on duty found the projectile had glanced off Freeman's right thigh and fractured his forearm. Freeman was transferred to an Atlanta hospital, where doctors performed tissue and vascular transplants on the arm using grafts from Freeman's left leg.

Freeman was released from the hospital two weeks later. The following night, on February 27, 1986, he died. The pathologist performing the autopsy said Freeman died of a pulmonary embolism or blood clot.

Bishop was tried by a jury and found guilty of malice murder.

1. Bishop first contends the trial court erred in denying his motion for directed verdict because the State did not establish all the essential elements of malice murder. In particular, Bishop claims the State did not prove beyond a reasonable doubt that he acted with malice aforethought, either express or implied.

Bishop contends the evidence demonstrated he positioned the rifle to point to the floor in front of the door, and not directly at the door opening with the intent to shoot whoever entered. He contends that by erecting the spring gun in this manner, as if to only scare burglars, he had neither the express malice to kill someone entering the door, nor any implied malice rising from the circumstances of the killing.

The State contends Bishop's theory rests exclusively on the fact that the bullet hit the door jamb at the base of the door and not Freeman directly. The State argues the evidence concerning the posi-

---

[1] Bishop was arrested on February 13, 1986. The victim died on February 27, 1986. Bishop was found guilty by a jury and sentenced to life imprisonment on September 16, 1986. The transcript was certified on January 27, 1987 and docketed in this court on January 30, 1987. The case was orally argued on April 20, 1987.

tioning of the gun in relation to the door can be construed to show the gun was in fact aimed with the intent of shooting whoever entered.

Whichever theory is accepted, it is undisputed that a high-powered rifle was positioned on chairs with the barrel pointed in the direction of the door to be triggered by opening the door. Even if Bishop's version is accepted as true, the situation nonetheless would present a jury question as to whether the act was such reckless disregard of human life as to be equivalent of a specific intent to kill. "A wanton and reckless state of mind is sometimes the equivalent of a specific intent to kill, and such state of mind may be treated by the jury as amounting to such intention when the wilful and intentional performance of an act is productive of violence resulting in the destruction of human life." *Myrick v. State*, 199 Ga. 244, 248 (34 SE2d 36) (1945).

We note that in *Myrick* the defendant admitted shooting the victim with a rifle fired from a distance of 60 yards. The defendant claimed the victim was trespassing when he aimed the rifle a foot to a foot and a half over the victim's head to scare him. This court nonetheless found a jury question existed as to whether the act was such a reckless disregard for human life as to be the equivalent of a specific intent to kill even if the defendant's version of the facts were accepted as true. See also *Carrigan v. State*, 206 Ga. 707 (58 SE2d 407) (1950), where the defendant claimed he believed his pistol to be unloaded when he pointed it directly at the victim's head and pulled the trigger.

We find the trial court did not err in denying the motion for directed verdict since, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. *Wright v. State*, 253 Ga. 1 (1) (316 SE2d 445) (1984); *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

Bishop also contends erecting the spring gun was not unlawful in his case because the killing of Freeman was justified. He cites OCGA § 16-3-23, which provides: "A person is justified in threatening or using force against another when and to the extent that he reasonably believes that such a threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation; however, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if: . . . (2) He reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and such force is necessary to prevent the commission of the felony."

Apparently Bishop's trailer had been broken into on several occasions. According to Bishop, the evidence indicates Freeman was bur-

glarizing the trailer when he was shot, although the State disputes this. Bishop argues had he been at home in the darkened trailer and Freeman attempted to enter unannounced he could have reasonably believed a felony was being committed upon his habitation and been justified in using deadly force pursuant to § 16-3-23.

The weakness in Bishop's argument is that he was working and not at home when the spring gun activated. Bishop contends the traditional rule observed in other jurisdictions is that a person is not justified in taking a life indirectly with a mechanical device unless he would have been justified had he been personally present and taken the life with his own hand.

We decline Bishop's invitation to adopt such a rule in these circumstances. Section 16-3-23 justifies the use of deadly force to protect a habitation only when the inhabitant "reasonably believes" the entry is made for the purpose of committing a felony. We find that under these circumstances, however, it was impossible for Bishop to form a reasonable belief in light of his absence from the trailer. "Allowing persons, at their own risk, to employ deadly mechanical devices imperils the lives of children, firemen and policemen acting within the scope of their employment, and others. Where the actor is present, there is always the possibility he will realize that deadly force is not necessary, but deadly mechanical devices are without mercy or discretion. . . . It seems clear that the use of such devices should not be encouraged. Moreover, whatever may be thought in torts, the foregoing rule setting forth an exception to liability for death or injuries inflicted by such devices 'is inappropriate in penal law for it is obvious it does not prescribe a workable standard of conduct; liability depends upon fortuitous results.' " *People v. Ceballos*, 116 Cal. Rptr. 233 (526 P2d 241, 244-245) (Cal. 1974), quoting Model Penal Code (Tent. Draft No. 8), § 3.06, comment 15.

2. Bishop also contends the trial court erred in denying his motion for directed verdict because the State did not demonstrate a direct causal connection between the act and the death beyond a reasonable doubt. He contends the death resulting from a pulmonary embolism or blood clot was too remote in time from the killing, and that the embolism could have resulted from factors other than the gunshot wounds.

Pathologist Fred Gilbert testified at trial that Freeman's death was caused by a pulmonary embolism between Freeman's heart and lungs. Dr. Gilbert said the origin of the clot was the area of Freeman's left leg from which bone and skin grafts were taken to repair his arm. Dr. Gilbert testified that embolisms usually develop in the lower extremities and can be brought on by surgery and hospitalization. He said when patients are immobilized with wounds to the extremities or fractured bones, the blood can become stagnant, clot and break loose.

It was Dr. Gilbert's opinion that without the gunshot wound and surgery in Freeman's case, it was unlikely a blood clot would have developed.

Dr. Jack Powell, who treated Freeman at the emergency room, said Freeman's wound was not life threatening when he entered the emergency room. But Powell said with such wounds, pulmonary clots are always a danger. Dr. Freeman also testified pulmonary embolisms such as the one that killed Freeman can have a wide variety of causes, and can be caused by stationary activity, such as taking a trip or sitting at a desk.

Both doctors stated pulmonary embolisms are unlikely to occur in a man of Freeman's age of 36 without some outside precipitating cause.

"Where one inflicts an unlawful injury, such injury is the proximate cause of death if the injury 'directly and materially contributed to the happening of a subsequent accruing immediate cause of the death.'" *Larkin v. State*, 247 Ga. 586 (1) (278 SE2d 365) (1981), quoting *Ward v. State*, 238 Ga. 367, 369 (233 SE2d 175) (1977). This court has held evidence of death by pulmonary embolism resulting from treatment after wounds were inflicted by a defendant can present a question for a jury as to whether the wound was the proximate cause of death. See *Larkin*, supra; *Rachel v. State*, 247 Ga. 130 (1) (274 SE2d 475) (1981); *Littles v. State*, 236 Ga. 651 (4) (224 SE2d 918) (1976). Reviewing the denial of Bishop's motion for directed verdict under the standard cited in Division 1, we find the trial court did not err in sending the case to the jury.

3. We have reviewed all the evidence in light of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), and find in the light most favorable to the jury's verdict that a rational trier of fact could have found Bishop guilty beyond a reasonable doubt.

*Judgment affirmed. All the Justices concur, except Smith, J., who dissents.*

SMITH, Justice, dissenting.

"Every man's home is his castle." This statement all of us have heard since childhood. This case involves the extent to which a man may use deadly force to protect that "castle."

In the venerable case *Collins v. Rennison,* 1 Sayer 138 (K.B. 1754), an English court described the allowable extent by employing the phrase "moliter manus imposuit." The use of this phrase indicated that a person should gently push a non-felonious intruder out the door. Blackstone, in advocating a tougher response to intrusions into the home, noted that all felonies were punishable by death. He advocated sanction of the use of deadly force to prevent an intruder from entering a home to commit a felony. 4 Blackstone's Commenta-

ries 188.

In 1820, the first "spring gun" case came on the scene. In *Ilott v. Wilkes*, 3 Barn. & Ald. 304, 106 Eng.Rep. 674 (K.B. 1820), the defendant set up a spring gun in some woods on his property. The gun worked as planned, injuring a trespasser. The Court of King's Bench entered a non-suit in favor of the defendant when evidence emerged showing that the plaintiff had notice of the spring gun.

In the case of *Bird v. Holbrook*, 4 Bing. 628, 130 Eng.Rep. 911 (C.P. 1828), the Court of Common Pleas heard a case similar to *Ilott* in which the plaintiff was injured by a spring gun while searching a neighbor's garden for his fowl. In *Bird*, unlike *Ilott*, however, the plaintiff had no notice of the spring gun. In the opinion of Chief Justice Best, who had taken part in the *Ilott* decision, the lack of notice distinguished the two cases, and the plaintiff was entitled to a verdict. In these early cases, the spring gun owner was arguably not subject to civil damages, much less a murder or assault charge.

Around this time, Parliament became involved in the spring gun debate, passing a statute which criminalized the use of spring guns. 7 & 8 Geo. 4, c.18 (1827). Parliament did, however, create an exception allowing the use of the guns between dusk and dawn in the home for the prevention of a felony. Id.; Bohlen & Burns, The Privilege to Protect Property by Dangerous Barriers and Mechanical Devices, 35 Yale L.J., 525, 541 n.46 (1926).

The first spring gun case in the United States appeared in Kentucky in 1832. *Gray v. Combs*, 30 Ky. 478 (1832). The Kentucky court neither approved nor disapproved of the earlier English cases in holding use of a spring gun to protect property justified under the circumstances. In *Johnson v. Patterson*, 14 Conn. 1 (1940), the Supreme Court of Connecticut in dicta rejected the use of spring guns sanctioned in *Gray*.

Since the early cases, the courts and legislatures in this country have, in the absence of complete prohibition, drawn a line between spring guns used in the home and spring guns used elsewhere. Some cases have stated that spring guns could be used to protect dwelling places when the owner could have used deadly force had he been present. See Prosser on Torts, p. 136 n.40 (5th ed. 1984). Others like the majority opinion here, flatly forbid the use of spring guns.

From the broad range of standards dealing with spring guns and criminal law, I would select the rule that views as justified a homicide committed by spring gun at night in the home of the defendant when the defendant can establish under the totality of the circumstances that he possessed a reasonable expectation that someone would be breaking into his home to commit a felony and that the victim was, indeed, breaking into his home to commit a felony. To do this, we simply should look to the intent of the defendant at the time that he

sets the spring gun, setting the chain of events leading to the death in motion, rather than to the time at which the victim is shot. Viewed in this manner, OCGA § 16-3-23 would justify a homicide such as the one involved in this case. I would reverse.

DECIDED JUNE 4, 1987.

*Word & Flinn, Gerald P. Word, Farmer, Rosenzweig, Kam, Jones & MacNabb, Joseph P. MacNabb,* for appellant.
*Arthur E. Mallory III, District Attorney, Randall K. Coggin, Assistant District Attorney, Michael J. Bowers, Attorney General, J. Michael Davis, Assistant Attorney General,* for appellee.