## Hamilton v. Howard.

(Decided May 13, 1930.)

HEAVRIN & MARTIN and GLOVER H. CARY for appellant.

KIRK & BARTLETT for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

In this action for assault and battery by Lorenzo Hamilton against Clarence Howard the jury found for Howard, and Hamilton appeals.

The petition aptly charges that on December 17, 1927, the defendant wrongfully, intentionally, maliciously, and willfully shot and wounded plaintiff with a pistol, and thereby inflicted on him serious and permanent injury by reason of which he has been damaged in the sum of $10,000. Howard answered in two paragraphs. In the first paragraph he denied certain allegations of the petition. The second paragraph is as follows:

"Pleading further, the defendant says that at the place and at the time mentioned in the petition wherein it is alleged that the defendant shot the plaintiff, as described in the petition the plaintiff assaulted this defendant and was in the act of attacking the defendant, and, as the defendant verily believed, the plaintiff was about to inflict serious bodily injuries to the defendant or probably take defendant's life, and that in acting as the defendant did he did no more than was necessary to protect himself from the assault and the threatened attack by the plaintiff.

"The defendant further states that just before the occasion mentioned and set out in the plaintiff's petition the plaintiff had wrongfully and without right invaded the defendant's home and had made overtures to the defendant's wife, and had sought to ingratiate himself into the affections of defendant's wife and to alienate her affections from this defendant and had suddenly run from defendant's house where he had attempted association with the defendant's wife for the purpose aforesaid, and, as defendant believed, was going to stay nearby in order that he might re-invade the defendant's home for the purpose aforesaid in defendant's absence. Whereupon to preserve the peace and to protect defendant's home from invasion as aforesaid and to protect the defendant's wife from plaintiff's efforts to alienate her affections as aforesaid, the defendant modestly spoke to the plaintiff and requested that he

desist such invasion of the defendant's home and such attentions to defendant's wife. Because of which protestations by the defendant, the plaintiff was about to attack the defendant and with great or serious injury to the defendant, when the defendant, to protect himself and in his necessary self-defense as aforesaid and for the purpose of protecting his home and his wife and preventing further invasion of his home as aforesaid fired his pistol and this is the shooting mentioned and referred to in plaintiff's petition."

The facts are these: Howard, who was 26 years of age at the time of the trial, and Hamilton, who was 29, were both married and lived a few miles from Hartford. Howard was related to Hamilton's wife, and he and Hamilton had been in business together and on friendly terms. There was some talk in the neighborhood concerning the frequency of Hamilton's visits to Howard's home, and the impropriety of the relations between Hamilton and Mrs. Howard. Howard learned of this and claims to have observed that Hamilton was paying undue attention to his wife. He says that Hamilton frequently came to his home, and, instead of joining him, would go around the premises with Mrs. Howard. Hamilton would go to the field where Mrs. Howard was at work, and if she were plowing he would follow her up and down the rows as she plowed while Howard worked in other parts of the field. For a while Hamilton and Howard were engaged in cutting logs together. Howard would go by Hamilton's home and accompany him to work. Though they would start off together Hamilton would return to the Howard home to leave his keys with Mrs. Howard. Though he would generally join the other workmen later, it is claimed that on one occasion he never showed up at all after returning to Mrs. Howard's house under the pretext of taking his keys back to the house. On the day of the shooting Howard said that he found Hamilton's keys at his house on the bed. Howard also said that, if Mrs. Howard was getting breakfast, Hamilton would go to the kitchen where she was; that, if she was milking, he would go out to the cow lot; that, if she were gearing the mules, he would go to the barn where she was engaged. Howard says that at first he was not

disturbed by Hamilton's attentions to his wife, but after Hamilton got her picture and went to telling that he was "having fun with that woman," and that he (Howard) was going to live with her only until the child got big enough to work, that caused trouble in his home. Howard then talked to Hamilton on several occasions and told him that the neighbors were talking about the matter. He asked Hamilton to stay away from his house. Hamilton "just laughed," and said he guessed he could. Hamilton did not stay away, but kept up his attentions to Mrs. Howard. Howard again remonstrated and warned him to stay away. After that they would not work together. Howard's father, who had observed Hamilton's attentions to Howard's wife, warned and advised Hamilton to stay away. Howard told Hamilton he was going to hurt him if he did not stay away. Howard describes the difficulty in the following language:

"I had been hauling coal for my brother and got in just a little before sundown and I was coming up the road and I seen my wife get a load of wood and go back in the house and just about that time he come out the same door she went in and he taken up through the woods and orchard circling for E. K. Moseley's, and I went up and got my gun and went toward where he was at, and I walked up and asked him if I hadn't told him to stay away, and talked to him and cried and begged him to stay away, and then I cursed him and told him to stay away, he acknowledged I had, and I told him I had talked every way I could to get him to stay away and I had another remedy I would try to see if that would do.

"Q. Did you tell him you were going to kill him? A. No, sir, I told him I didn't aim to kill him and he need not think it.

"Q. What did he say? A. He didn't say anything.

"Q. I mean when you told him you had asked him to stay away? A. He finally murmured out, after I asked the second time, once.

"Q. Did you ask him on more than one occasion to stay away? A. Several times, more than once.

"Q. But he said 'once'? A. Yes, he acknowledged once.

"Q. Then you did shoot him? A. Yes, sir.

"Q. What occurred after that? A. Well, after the shooting occurred, the first thing he said was that he said 'Go call the doctor, Lige,' and I started for the doctor, and I asked him if he wanted me to take him in the house and he said yes, and I asked him if he wanted me to take him home and he said no, and I said all right then, and in a minute or so he said yes, you can take me home if you want to and I went down to the house and got the wagon and spring seat and hauled him home."

Mrs. Ethel Howard, a sister-in-law of Clarence Howard, testified that about 5:30 or 6:00 o'clock on the evening of December 17, 1927, as she approached Howard's home, she saw a fellow she took to be Hamilton at the back of the house. E. K. Moseley, who lived about 250 yards from Howard, and on whose premises the shooting occurred, testified that he was at the chip yard engaged in chopping some stove wood when Hamilton came up, and gives the following account of the shooting:

"Yes, sir, he came down the back way and told me not to let the dog bite him, and I told him to come ahead, and he come and set down on a pile of wood and he had been there four or five minutes when I looked up and seen Clarence coming up with his revolver and I never said anything, and he said, 'Lo, I caught you this time' and he said I have begged and persuaded you to stay away from my house and I am going to try another plan.

"Q. Did he tell him he had agreed— A. Yes, sir, he said he had begged and cried—

"Q. What did Hamilton say when Howard told him he had told him to stay away from his home? A. He said he might have told him once. He denied being there.

·"Q. He shot him three times? A. He shot three times, reckon he hit him every time."

On cross-examination Moseley stated that Hamilton had been there something like three, four, or five minutes, when the shooting occurred. Hamilton told Howard that he had not been to his house. When shot Hamilton was sitting on a block of wood at the wood pile and did not undertake to do a thing in the world, "and made no move like he would."

On the other hand, Hamilton testified that he had a wife and three children, and had known Howard all of his life. He had been in the habit of going to Howard's home to see all of them, and not particularly to see Mrs. Howard any more than Mr. Howard. His particular business in going there was to buy white mule from Clarence. Clarence had told him to go there whether Clarence was there or not, and he would go there some two or three times a week. On the occasion in question he started up to Lige Moseley's and passed through Clarence Howard's lot. He had to go that way. Clarence's wife was standing in the door. He inquired where was Clarence, and she said he had gone to the coal bank and would be back about 4 o'clock. It was then a little after 4, and she said he ought to be there by that time. He said, "I am going up to Lige's." He then went through the apple orchard and looked at some saplings. He did not stop at Clarence's house, or go in the house. He did not run out the back door or through the woods. On reaching Moseley's he found Moseley chopping wood and told him not to let the dog bite him. Moseley said he would not, and he sat down by Moseley and engaged in conversation about a hog. While sitting there with his feet crossed Clarence Howard came up and said something. He said to Clarence, "What do you mean?" and Clarence commenced shooting. He was shot in each knee, and one shot penetrated his leg higher up. He suffered a great deal from his wounds, and was still suffering. His knees were stiff and were not getting any better. Never at any time did Clarence talk to him about not going to his house, or accuse him of being too intimate with his wife. He did see Clarence Howard's father, Clarence, and his wife, in the cornfield. She was not plowing at all. He walked around a while and talked to all of them. Estill Howard never called him off or advised him not to go to Clarence's place. Estill Howard did ask him what he had come for, and he told him he had come to get a quart of liquor. On several occasions he went with different parties to Clarence's home to get liquor. Brownlow Gossett never told him to stay away. On the occasion when he was shot he never attempted to do anything to Howard. He never tried to hurt him in any way. On cross-examination he testified that on the evening of the shooting he just passed by Howard's premises, and stopped and talked to his wife for a minute. It was cold

that afternoon. He did not have any whisky with him, and had not been drinking that day. Sometimes he drank right smart. He could drink a quart a day. He did not get any whisky on that occasion. When he was at the home he judged it was about 4 o'clock. He thought he would see Clarence if he was there. It made no particular difference whether he saw him that day or not. His wife said that Clarence might be there pretty soon and might not be there until after dark. He did not wait for Clarence. He wanted to see Lige. He did not hear the wagon coming. At the time of his talking to Clarence's wife he was about 20 steps from the big road. He aimed to see Clarence as he came back by home. He aimed to come back that night and see him about the splicing as soon as Lige told him whether he would buy the hog or not. Dr. I. J. Hoover deposed that Hamilton was shot twice in one leg and once in the other. He had been shot through both knees. Such injuries as he saw produced pain and suffering. Both legs were X-rayed, the bullets removed from the knee joints and the joints irrigated with ether and closed. Such wounds do not usually give any permanent injury unless infected, and no infection followed the operation. In his opinion the injury was not permanent. In rebuttal Howard testified he never saw a quart of whisky on the day they were plowing or at any other time. Estill Howard testified that on the occasion when Hamilton came into the cornfield there was no talk about whisky.

Over the objection of plaintiff the court instructed the jury as follows:

"I. The court instructs the jury that you should find for the plaintiff and award him in damages such sum as you may believe from the evidence will fairly and reasonably compensate him for any impairment of his power to labor and earn money resulting directly from the shooting and wounding described to you in evidence, and for the pain and suffering which was caused to him by such shooting, unless you believe as set out in Instruction No. II, but if you believe as in Instruction No. II you will find for the defendant.

"II. The defendant had the right to protect his home from intrusion or invasion and if you believe from the evidence that before the occasion on which the plaintiff was shot by defendant, as

described to you in evidence, the plaintiff had invaded the defendant's home or had made overtures to the defendant's wife or had sought to ingratiate himself into the affections of defendant's wife or to alienate her affections from the defendant and that the defendant had requested the plaintiff not to go to the defendant's home or to stay away from defendant's home or to desist his attentions to defendant's wife, and if you believe from the evidence plaintiff failed to heed said warnings, if any were given him, and if you believe from the evidence that in shooting and wounding the plaintiff, as described to you in the evidence, the defendant used only such force as was reasonably necessary to prevent the plaintiff from further invading the defendant's home or paying attention to the defendant's wife, then you should find for the defendant.

"III. If you find for the plaintiff you may award him such sum by compensatory damages as you may believe from the evidence will compensate him for any physical or mental suffering which he endured, or for any impairment of his power to earn money as you may believe would be the proximate and necessary result of his injury, if any. And if you believe from the evidence that the defendant, not in the necessary or to him apparently necessary defense of himself or his home, as supposed to you in Instruction No. II, wantonly and maliciously assaulted and shot the plaintiff, you may award the plaintiff punitive damages, but the entire amount that you may allow to the plaintiff shall not exceed the sum of $10,563.00, the amount claimed in the petition."

The argument in support of the defense pleaded in paragraph 2 of the answer and of instruction No. 2 given by the court may be summarized as follows: Hamilton was paying undue and improper attention to Howard's wife, and was endeavoring to win his way into her affections. Though warned by Howard and others to stay away from his home, Hamilton did not stay away, but persisted in his attentions and intrusions. The immediate act of Hamilton in running away from the Howard home was not the cause of the shooting. It was merely the straw that broke the camel's back. It was but one of a long series of oft-repeated and recurring

offenses. Patience had ceased to be a virtue. Numerous warnings and commands had proved ineffective. The time had come when Howard was compelled to use some force or stand by and see Hamilton continue to invade his home and impose himself upon his wife. "If there was a drop of red-blooded manhood about Howard; if he cared a whit for his home and family; if he was any part of a man at all, it was time for him to act and to act with force and effectiveness, in the protection of his castle and those in it who were dependent upon him. Whether Howard was trying to prevent Hamilton from stealing his wife's affections, thus breaking up his home, or was trying to protect his wife from undue influence and embarrassment and protect his home from the tongue of evil report and bad repute in the community, he had the right to protect his home against invasion for either purpose, and since the force he used was patently necessary and undeniably effective, and actually resulted in but little temporary damage, the verdict of the jury in favor of Howard should not be set aside. Though the rule contended for is ably and plausibly presented, and though it may strike a popular chord and find some support in the views of many people, it is not the law and cannot be sanctioned by the courts. The right to act in defense of one's home is confined to cases of attempted forcible entry for the purpose of committing a felony or of inflicting great bodily harm or offering personal violence to a person dwelling or being therein, and to cases of attack or attempted attack on the home with firearms for any one of such purposes. Hendrickson v. Commonwealth 232 Ky. 691, 24 S. W. (2d) 564. It has never been applied where the person wounded or killed was off the premises, and was not then engaged in any kind of attack on the home. It matters not that Hamilton's conduct was reprehensible, or that Howard's provocation was very great. Howard could not follow Hamilton off his premises and to the premises of another 250 yards distant and shoot and wound him while he was quietly talking to another and making no attempt to attack the Howard home in any manner whatsoever, and justify on the ground that he acted in defense of his home. Though the situation was a trying one, and calculated to arouse one's sympathy, after all it is simply a case where Howard took the law in his own hands and shot and wounded Hamilton to punish him for what he had done, and to deter him from future attentions to his wife. In the circumstances,

the facts relied on, even if Howard's theory of the case be accepted, constituted no defense so far as compensatory damages were concerned, and instruction No. 2 submitting the defense of home should not have been given.

However, the facts pleaded and proved are admissible for another purpose. It was the rule at common law that the defendant could not give in evidence in mitigation of damages the acts or declarations of the plaintiff at a different time, or any antecedent acts which were not fairly to be considered a part of one and the same transaction, though they may have been ever so irritating or provoking. Rochester v. Anderson, 1 Bibb 428; Slater v. Sherman, 5 Bush 206; Carson v. Singleton, 65 S. W. 821, 23 Ky. Law Rep. 1626. Recognizing the harshness of this rule, the Legislature in the year 1906 enacted what is now section 73a-1, Kentucky Statutes, reading as follows: "In all civil actions for damages inflicted by an assault, or by an assault and battery, the defendant shall have the right to plead as a defense to the claim for punitive damages, and to introduce in evidence in mitigation of damages, any matter of provocation which preceded the assault or assault and battery. If the matter of provocation prompted the assault or assault and battery, and was of a nature as to cause a person of ordinary prudence and judgment to take the action taken by the defendant."

The statute has been construed in several cases, and it uniformly has been held that matters of provocation preceding the assault and battery may be pleaded and proved in mitigation of punitive damages, but not of compensatory damages. Renfro v. Barlow, 131 Ky. 312, 115 S. W. 225; Roberson v. McKinley Woodfork, 155 Ky. 206, 159 S. W. 793; Marshall v. Glover, 190 Ky. 113, 226 S. W. 398; Barth v. Stewart, 229 Ky. 840, 18 S. W. (2d) 275. We think the provocation relied on by Howard falls within the statute, and could be proved in mitigation of punitive damages.

Though pleaded and sought in the petition, the court did not authorize a finding for reasonable medical and hospital bills incurred. It is insisted that this was proper, because the bills were paid by Hamilton's father and not by him. The evidence, however, discloses that Hamilton's father paid the hospital and medical bills of $153 for his son, and that his son said he would pay him.

The case being one where the father may sue and recover from the son, there can be no doubt that the son may recover from him who caused the injury.

There is no substantial evidence in the record that Hamilton's injuries are permanent. That being true, he is not entitled to recover for the permanent impairment of his power to earn money, but only for the temporary impairment thereof during such time as the jury may believe from the evidence such impairment has continued.

On the return of the case the court will instruct the jury as follows:

"1. You will find for plaintiff and award him such sum in damages as you may believe from the evidence will fairly compensate him for his reasonable hospital and medical bills, if any, not exceeding the sum of $153.00; for his mental and physical suffering, if any, directly resulting from the injuries inflicted by defendant, and for the temporary impairment, if any, of his power to earn money directly resulting from his injuries during such time as you may believe from the evidence such impairment, if any, has continued, but not exceeding in all the sum of $10,153.00, the amount claimed in the petition."

"2. If you believe that defendant wantonly and maliciously shot and wounded and injured plaintiff, you may in addition to compensatory damages award plaintiff punitive damages, not exceeding in all the sum of $10,000.00. If, however, you believe from the evidence that plaintiff gave to the defendant such provocation to assault and injure plaintiff as would cause an ordinarily prudent man under like or similar circumstances so to assault and injure plaintiff, and that such provocation, if any, did prompt defendant to assault and injure plaintiff, you may consider such provocation, if any, in mitigation of the punitive damages, if any, which you may find for plaintiff."

Judgment reversed, and cause remanded for a new trial consistent with this opinion.