Steve MONDIE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2002–SC–0534–DG.

Supreme Court of Kentucky.

March 17, 2005.

Donald A. Thomas, Liberty, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Dennis Shepherd, Assistant Attorney Gen-

eral, Office of Attorney General, Criminal Appellate Division, Anitria M. Alo, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice KELLER.

## I. ISSUE

Appellant, Steve Mondie, was convicted of Second–Degree Assault for shooting Greg McGowan. Appellant testified that he shot McGowan only after ordering him to leave Appellant's residence and then being hit in the mouth by McGowan. Appellant tendered a protection against burglary instruction, which the trial court refused. Was Appellant entitled to such an instruction? Because the evidence supported a finding that Appellant shot McGowan to prevent a burglary of his residence, we hold that the trial court erred in refusing to give a protection against burglary instruction. Accordingly, we reverse Appellant's conviction and remand for a new trial.

## II. BACKGROUND

In 1991, Appellant, who was recovering from back surgery, got into in a fist fight with McGowan and McGowan knocked out four of Appellant's teeth. Eight years later, after McGowan was paroled on unrelated charges, McGowan pulled his vehicle into Appellant's driveway, got out of his vehicle, and approached Appellant and his friend, James "Jim Bob" Callinan, who were on the porch of Appellant's mobile home drinking beer. Appellant met McGowan in the driveway and told him to leave, but McGowan refused. Appellant

entered his home and McGowan, uninvited, followed him inside. Appellant again told McGowan to leave. McGowan then hit Appellant in the mouth. Appellant went to his bedroom, retrieved his .45 caliber semi-automatic pistol, and returned to the living room area. Appellant told McGowan to leave a third time, but instead McGowan hit Appellant in the face once more. Appellant then shot twice at McGowan, hitting him once in the chest. Appellant and Callinan then escorted McGowan, who insisted on leaving and driving himself, to his vehicle. As McGowan drove off, Appellant stood in the driveway and fired two shots up in the air so, in Appellant's words, "he wouldn't come back."

Appellant called the Casey County Sheriff's Department to report the incident. Kentucky State Police Lieutenant Mitch Bailey and Detective Ricky Underwood investigated the scene. They found two empty cartridge casings lying approximately three inches apart on the floor in the residence. They found two more empty casings in the driveway.

Callinan's testimony [1] supported Appellant's version of what occurred that night. McGowan's recitation of the events that night, however, differed substantially from Appellant's and Callinan's version. McGowan claimed that he was not the initial aggressor and that the shooting occurred in the driveway and not in Appellant's house. "The decision as to whose story to believe [was], of course, an issue for the jury to decide." [2]

Appellant was indicted for First–Degree Assault and convicted of the lesser-included offense of Second–Degree Assault. He appealed his conviction to the Court of Appeals, where he claimed primarily that

---

1. Callinan did not testify in person, but by agreement the transcript of his statement to the police was read to the jury as his testimony.

2. *Webb v. Commonwealth,* 904 S.W.2d 226, 229 (Ky.1995).

the trial court, although it had given a self-protection instruction, had erred when it refused to give the protection against burglary instruction that he had tendered. The Court of Appeals found that "[t]he record does not indicate that McGowan was committing burglary or any other crime justifying the use of deadly force in protection of a dwelling." It then held that "[t]he record did not support Mondie's claim of burglary, and thus, [it] affirm[ed] the trial court's determination that a property defense instruction was not necessary." We address this issue, and due to the likelihood of a recurrence on retrial, we also address Appellant's claims regarding (1) testimony about the proximity of the cartridge casings and (2) the Commonwealth's Attorney's comments in his closing argument about the capacity of the pistol's magazine.

## III. ANALYSIS

### A. Protection Against Burglary Instruction

■ "It is well settled that a defendant is entitled to have his theory of the case submitted to the jury." [3] Appellant argues that the evidence was sufficient to support a finding that McGowan was committing a burglary when he shot him, and accordingly, Appellant contends that he was entitled to a protection against burglary instruction. We agree and for this reason, we reverse Appellant's conviction.

■ "Historically, burglary was born into the common law as a separate substantive offense out of a desire to protect persons in the sanctity of the home." [4] Thus "[a]t common law burglary [was] the breaking and entering at nighttime of another's dwelling with intent to commit a felony therein." [5] And from the earliest days of Kentucky's common law, a homicide was justifiable when committed to prevent a burglary. [6] It was thought that the commission of common law burglary contained an element of potential danger to the person against whom it was committed, and therefore, the prevention of burglary by killing the intruder was excusable. [7]

Before the adoption of the Kentucky

**3.** *Davis v. Commonwealth,* 252 S.W.2d 9 (Ky. 1952); *see also Sanborn v. Commonwealth,* 754 S.W.2d 534 (Ky.1988); *Blevins v. Commonwealth,* 258 S.W.2d 501 (Ky.1953); RCr 9.54(1) ("It shall be the duty of the court to instruct the jury in writing on the law of the case ....").

**4.** *Funk v. Commonwealth,* 842 S.W.2d 476, 483 (Ky.1992) (Liebson, J., dissenting in part, concurring in part).

**5.** *Rayburn v. Commonwealth,* 476 S.W.2d 187, 189 (Ky.1972); *Hayes v. Commonwealth,* 171 Ky. 291, 188 S.W. 415, 417 (1916) ("[T]here are three essential ingredients in this offense: (a) A breaking and entering in the nighttime (b) of the mansion house of another (c) with intent to commit some felony."); *Daniels v. Commonwealth,* 4 S.W. 812 (Ky.1887) ("The crime of burglary at common law consists in breaking and entering a mansion-house in the nighttime with intent to commit a felony."); *but see Hedges v. Commonwealth,* 937 S.W.2d

703, 707 (Ky.1996) ("At common law, burglary was the unlawful entry into the dwelling of another in the nighttime with the intent to commit a *crime* therein." (emphasis added)).

**6.** *Flynn v. Commonwealth,* 204 Ky. 572, 264 S.W. 1111, 1112 (1924); *see Commonwealth v. Beverly,* 237 Ky. 35, 34 S.W.2d 941, 943 (1931) ("But it appears to be the sound rule that one who is without fault may shoot and kill another if it be necessary, or apparently necessary, to prevent the commission of a felony on the person or habitation, or any other felony involving violence or the element of potential danger to the person, such as rape, arson, burglary, and robbery."); *Gray v. Combs,* 7 J.J.Marsh. 478, 30 Ky. 478, 23 Am. Dec. 431 (1832).

**7.** *Howard v. Commonwealth,* 198 Ky. 453, 248 S.W. 1059, 1061 (1923).

Penal Code[8] ("Penal Code"), Kentucky adopted numerous burglary statutes, but "case law ... interpreted the statutes in accord with common law principles."[9] Additionally, Kentucky cases continued to recognize that homicide was justifiable to prevent a burglary, although "Kentucky's most recent cases seemed to authorize the use of deadly force only to prevent entries designed to commit felonies or inflict violence upon dwellers."[10] But with the enactment of the Penal Code in 1974, "[a] burglary is committed when someone unlawfully enters (or remains inside) a building with intent to commit a crime therein,"[11] which is a more expansive concept of burglary than existed under the common law. The defense against burglary was also codified and broadened with the adoption of the Penal Code. KRS 503.080 provides:

(1) The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is immediately necessary to prevent:

(a) The commission of criminal trespass or burglary in a dwelling, building or upon real property in his possession or in the possession of another person for whose protection he acts; or

. . . .

(2) The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that the person against whom such force is used is:

. . . .

(b) Committing or attempting to commit a burglary of such dwelling . . . .

"Dwelling" is defined as "any building or structure, though movable or temporary which is for the time being either totally or partially the defendant's home or place of lodging."[12] Thus, with the Penal Code's broadening of burglary to include unlawful entry for any crime—rather than limiting it to felonies—and from a literal reading of KRS 503.080(2)(b), "a dweller is privileged to use deadly force against unlawful entry for any criminal purpose (including petty theft and simple assault)."[13] But is such a broad privilege to use deadly force what the General Assembly intended?

"A statute should be construed, if possible, so as to effectuate the plain meaning and unambiguous intent expressed in the law."[14] "Where the words

8. KRS Chapters 500 to 534.

9. ROBERT G. LAWSON & WILLIAM H. FORTUNE, KENTUCKY CRIMINAL LAW § 4–4(c)(3) (Lexis Law Publishing 1998) [hereinafter KENTUCKY CRIMINAL LAW].

10. *Id.* (citing *Sizemore v. Commonwealth,* 285 Ky. 499, 148 S.W.2d 341, 342 (1941)) (" 'The right to act in defense to one's home is confined to cases of attempted forcible entry for the purpose of committing a felony or of inflicting great bodily harm or offering personal violence to a person dwelling or being therein, and to cases of attack or attempted attack on the home with firearms for any one of such purposes.' " (quoting *Hamilton v. Howard,* 234 Ky. 321, 28 S.W.2d 7, 10 (1930)); *Fore v. Commonwealth,* 291 Ky. 34, 163 S.W.2d 48, 50 (Ky.1942) ("While a mere trespass on the premises of another will not justify the owner of the premises in shooting the trespasser unless the trespass be accompanied by acts that amount to an assault upon the person of the owner such as would warrant him in exercising the right of self-defense to protect his person[.]")).

11. *Id.;* KRS 511.040.

12. KRS 503.010(2).

13. KENTUCKY CRIMINAL LAW, *supra* note 9, § 4–4(c)(3).

14. *Bob Hook Chevrolet Isuzu, Inc. v. Com. Transp. Cabinet,* 983 S.W.2d 488, 492 (Ky. 1998).

used in a statute are clear and unambiguous and express the legislative intent, there is no room for construction and the statute must be accepted as it is written." [15] We cannot ignore the plain meaning of a statute simply because we might consider another interpretation to state a better policy.[16] Thus, in construing a statute, "[w]e have a duty to accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion." [17] Additionally, "[t]he original draft of KRS 503.080(2)(b) authorized the use of deadly force to prevent burglary only if a defender believed that a burglar intended 'to use physical force against an occupant of his dwelling." ' [18] The General Assembly, however, "dropped this limitation, for undocumented reasons, and adopted the deadly force rule now in effect." [19] For that reason, and given that the protection against burglary defense was codified at the same time that the definition of burglary was broadened, we must hold that the General Assembly intended the literal meaning of the statute, even though in so doing it "authorize[d] an incredibly generous use of deadly force, far beyond what one would expect under a policy that puts a high premium on the value of human life." [20] It is the province of this Court under the constitution to decide what the law is and not to declare what it should be.[21] If the statute "is unwise or impolitic, the remedy rests with the Legislature; not with the courts." [22]

■■■ As previously noted, Appellant tendered a protection against burglary instruction, which the trial court rejected. The Court of Appeals, despite recognizing that "the evidence before the trial court is conflicting as to whether McGowan actually entered the Mondie residence" and that "Mondie claims that McGowan entered his home ... and then physically attacked him," affirmed this omission and stated that "[t]he record does not indicate that McGowan was committing burglary or any other crime justifying the use of deadly force in protection of a dwelling." We must disagree. Based on Appellant's and Callinan's testimony, the jury could have reasonably believed that McGowan had entered or remained in Appellant's home with the intent to assault him, thereby committing a burglary, and that Appellant shot him, believing that it was necessary to prevent the burglary. Accordingly we hold that Appellant was entitled to a protection against burglary instruction and that the trial court erred in failing to give such an instruction. Moreover, because KRS 503.080(2)(b)'s privilege of protection against burglary "is broader than the privilege to use deadly force in the protection of [one]self [under KRS 503.050], in that under [KRS 503.080(2)(b) ] a defendant need not believe such force necessary to

**15.** *Griffin v. City of Bowling Green*, 458 S.W.2d 456, 457 (Ky.1970).

**16.** *ITT Commercial Finance Corp. v. Madisonville Recapping Co.*, 793 S.W.2d 849, 852 (Ky. App.1990).

**17.** *Bailey v. Reeves*, 662 S.W.2d 832, 834 (Ky. 1984); *Western & Southern Life Ins. Co. v. Weber*, 183 Ky. 32, 209 S.W. 716, 717 (1919) ("[N]o intention shall be read into the wording of the statute contrary to the plain meaning of the language employed.").

**18.** KENTUCKY CRIMINAL LAW, *supra* note 9, § 4–4(c)(3) (citing Kentucky Crime Commission/Legislative Research Commission, *Kentucky Penal Code Final Draft*, 47 (November 1971)).

**19.** *Id.*

**20.** *Id.*

**21.** *See Minor v. Happersett*, 21 Wall. 162, 88 U.S. 162, 178, 22 L.Ed. 627 (1874).

**22.** *Drury v. Franke*, 247 Ky. 758, 57 S.W.2d 969, 982 (1933).

protect against death or serious physical injury,"[23] we hold that the failure to give the protection against burglary instruction was reversible error.[24]

## B. Cartridge Casings

Appellant argues that he was substantially prejudiced when the trial court allowed Lt. Mitch Bailey to testify that the two cartridge casings found in Appellant's residence were too close together to have been normally fired and ejected from the .45 caliber pistol Appellant used. This testimony provided the basis for the Commonwealth's Attorney's argument that the casings had been planted in the residence and that the shooting actually occurred in the driveway, thereby undercutting Appellant's protection against burglary defense. Appellant asserts that Lt. Bailey was not qualified to testify as an expert and could not testify as to his lay opinion because he had no personal knowledge of the pistol's ejection pattern because it had not been tested. The Appellant also asserts that he preserved this issue by contemporaneously objecting to Lt. Bailey's testimony.

Lt. Bailey testified that he had found the empty cartridges in Appellant's home and that they were only "two and a half to three inches" apart. He also testified that he had been on the Kentucky State Police for sixteen years, that he had been trained in the use of firearms, and that he used firearms on a regular basis. He and the Commonwealth's Attorney then engaged in the following exchange:

> Commonwealth's Attorney: Are you familiar with a semi-automatic weapon and how it would eject a shell after being fired?
>
> Lt. Bailey: Yes.
>
> Commonwealth's Attorney: And based on the location of those shell casings, was that consistent with the firing of a semi-automatic weapon two consecutive times and the ejection of those two shell casings?
>
> LB: I found it to be odd that they would be there together, yes.
>
> Commonwealth's Attorney: And why is that?

---

23. KRS 503.080 Kentucky Crime Commission/LRC Commentary (1974).

24. *Rudolph v. Commonwealth*, 504 S.W.2d 340, 340–341 (Ky.1974) ("In *Kohler v. Commonwealth*, Ky., 492 S.W.2d 198 (1973), where a defendant was convicted for selling heroin, having admitted the act but claiming that he sold the heroin in order to assist law enforcement officers, but a police officer testified that there was no arrangement with defendant that he (defendant) would cooperate with police, we stated, 'We have consistently recognized ... that when a defendant confesses the doing of the act of which he stands accused but asserts a legal excuse or justification exonerating him from criminal intent the court should submit his theory of defense in concrete form ....' "); *Edwards v. Commonwealth*, 429 S.W.2d 859, 860 (Ky.1968) ("The court did not affirmatively instruct the jury so as to encompass this theory of defense. The failure to so instruct was error .... In the

circumstances shown in this case the defendant was entitled to an affirmative instruction within the rationale of the authorities cited, and we must reverse the judgment of conviction for the failure of the court to so instruct the jury."); *Evitts v. Commonwealth*, 257 Ky. 586, 78 S.W.2d 798, 799–800 (1935) ("We have held repeatedly that, where an accused admits the offense, or essential elements of the offense, but relies upon facts or circumstances amounting to an avoidance of the crime, he is entitled to a concrete instruction upon his theory of the case, and a mere general instruction is not sufficient .... We are of the opinion that the failure of the court to give a concrete instruction on the defendant's theory of this case was sufficiently prejudicial to require reversal."); *Sebastian v. Commonwealth*, 585 S.W.2d 440, 441 (Ky. App.1979) ("We conclude that Sebastian was at least entitled to an instruction on his defense of entrapment. Failure to give such an instruction constitutes reversible error.").

LB: Based on what I've seen at the firing range and based on my experiences as a detective for five years and the number of shooting incidents, they're generally scattered a little bit further apart from each other from a number of feet to a number of yards. I just found it odd.

Commonwealth's Attorney: Did you say it would be unlikely that a weapon would eject two shell casings that would land that close to each other?

Mr. Thomas: Objection, calls for speculation.

Judge: Overrule your objection.

Commonwealth's Attorney: Do you say it's unlikely?

LB: I would find it unlikely, yes.

Before Lt. Bailey testified the jury heard similar testimony from Detective Underwood, i.e., that he had weapons training and that he was familiar with firearms. The Commonwealth's Attorney introduced into evidence photographs that Det. Underwood had taken of the location of the shell casings inside Appellant's home. Det. Underwood and the Commonwealth's Attorney then engaged in a series of questions and answers similar to those with Lt. Bailey:

Commonwealth's Attorney: Now, you stated Detective Underwood, that you are familiar with the way a semi-automatic weapon would eject a shell when it's fired. Were there shell casings, the location of them found, in such a way or in such a manner that would indicate that they were fired from a weapon consecutively and ejected and landed in that position?

DU: I'm not saying it's impossible, but it would be hard to, most of the time you don't see shell casings laying in the same proximity because most of the time they, in a semi-automatic pistol, when it's fired, especially an automatic, will eject the—when it ejects, it ejects out to the right and upward and back. You know it could have possibly hit the wall and fell down there and been close, but not likely to have happened. Most of the time what we have we look for shell casings, they are usually found several feet apart. You know, they're not located most in the same area. They never, like standing over a firing range firing, it will eject the shell casings, if you sit there and pull the trigger and keep pulling the trigger, the shell casings won't fall close to each other, it just kicks them out.

Commonwealth's Attorney: And the jury will be able to look at that photograph here but to give them an idea, how close were those shell casings found to each other?

DU: About three inches apart.

Commonwealth's Attorney: Three inches apart?

DU: Three or four inches.

Commonwealth's Attorney: Based on—now Mr. Mondie told you where he contended he was standing when he fired the weapon, is that right?

DU: Yes.

Commonwealth's Attorney: Is it likely that that's where those shell casings landed given where he said that he was standing?

DU: In my opinion, it's not likely, no.

On cross-examination, Det. Underwood testified as follows:

Mr. Thomas: Det. Underwood, has that firearm ever been sent to the lab?

Det. Underwood: No, it wasn't.

Mr. Thomas: So, it hasn't been tested for ejection patterns or anything like that, where it throws shells.

DU: No. We didn't send it to the lab. There was no dispute about what gun

was used, so there was no need really to send it to the lab at that time.

Mr. Thomas: Would you agree that if you had asked for it, they could have fired the weapon and got an angle of ejection and an average length of ejection and stuff for that particular firearm?

DU: Yes, they could have.

Mr. Thomas: So the testimony you gave earlier, that's just based on your experience with other firearms on the range, not from your experience with that firearm.

DU: Correct.

Mr. Thomas: Would you agree, I think there was a photograph circulating around here, I think you may have indicated it might have bounced off the wall?

DU: Yes, it could have.

While defense counsel did object to Lt. Bailey's testimony as a lay witness, he did not object to the failure to qualify Lt. Bailey as an expert on ejection patterns and did not request a *Daubert*[25] hearing, nor was there any objection to Det. Underwood's similar testimony. Ordinarily, this matter would be resolved by the fact that the error was not preserved. However, as the case is being remanded, further comment is warranted.

Speculation by a lay witness is not helpful to the jury,[26] but "[t]he degree to which a witness may give an opinion, of course, is predicated in part upon whether and the extent to which the witness has sufficient life experiences that would permit making a judgment as to the matter involved."[27] On the other hand, in order to testify as an expert, "a witness [must be] qualified as an expert by knowledge, skill, experience, training or education."[28] Opinions as to ejection patterns are indeed expert evidence under KRE 702, i.e., "general truths derived from specialized experience,"[29] as they involve technical information learned through specialized experience or training that would help the jury interpret the facts of the case. Testimony on how cartridge casings are ejected from a particular semi-automatic weapon would allow the jury to draw conclusions about the proximity of the casings that they would otherwise be unable to make. And the officers in this case went even further because their testimony as to the unlikeness of the ejection pattern found in Appellant's home provided the conclusions for the jury.

Although such testimony is expert evidence, a trial court is not required to hold a *Daubert* hearing before the testimony is admitted.[30] However, "[e]ssential fairness in a trial requires that the trial

**25.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**26.** RICHARD H. UNDERWOOD & GLEN WEISSENBERGER, KENTUCKY EVIDENCE 2004 COURTROOM MANUAL 344 (Anderson Publishing Co.2003) [hereinafter KENTUCKY EVIDENCE MANUAL]; ROBERT G. LAWSON, KENTUCKY EVIDENCE LAW HANDBOOK § 6.05, at 274 (3d ed.1993) [hereinafter KENTUCKY EVIDENCE HANDBOOK].

**27.** KENTUCKY EVIDENCE MANUAL, *supra* note 24, at 343.

**28.** KRE 702.

**29.** *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238, (1999).

**30.** *See City of Owensboro v. Adams*, 136 S.W.3d 446, 451 n. 1 (Ky.2004) ("Nevertheless, a court need not always hold a *Daubert* hearing even when the evidence is offered in a jury trial, *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir.2000), though it should do so when admissibility is not obvious from the record. *Commonwealth v. Christie*, Ky., 98 S.W.3d 485, 488 (2002)."); *Tharp v. Commonwealth*, 40 S.W.3d 356, 367–68 (Ky.2000),

court carefully scrutinize the qualifications and the testimony of the officer before permitting his opinion testimony to be submitted to a jury"[31] because "expert opinion based on speculation rather than reasoned analysis and judgment is of no assistance to triers of fact."[32] As Det. Underwood's testimony revealed, not all firearms have the same ejection pattern, some are erratic while others are consistent, and even the "surface the cartridge cases land on ... may have great bearing on the pattern displayed."[33] Both officers stated that they were testifying from their experience on the firing range and on crime scenes and not from their experience with that specific .45 or any other .45 caliber pistol. "We decline to speculate on the outcome of an unrequested *Daubert* hearing or to hold that failure to conduct such a hearing *sua sponte* constitutes palpable error."[34] However, without more, as the record stands, the officers' qualifications are insufficient to allow them to testify on retrial as to the ejection pattern of Appellant's .45 caliber pistol.

### C. Prosecutor's Comment

■ During Det. Underwood's testimony, the Commonwealth's Attorney introduced Appellant's .45 caliber semi-automatic pistol. Det. Underwood testified that the weapon was the one Appellant used to shoot McGowan. The Commonwealth's Attorney also introduced the still-loaded magazine. Although there was no testimony concerning the capacity of the magazine, how many rounds were found in the magazine, or if a round was still chambered in the pistol when it was recovered from Appellant's home, the Commonwealth's Attorney used this physical evidence in closing to support his theory that McGowan was shot outside and that Appellant planted the cartridge casings in the house:

> Commonwealth's Attorney: Nobody is denying that there were two shots fired outside in the driveway. Even Steve has told you that. There are six live rounds here. Yeah, he could have told the officers that he had nine rounds in his clip. But the problem is this clip holds seven. It's a seven round clip.
> Mr. Thomas: Objection your honor, that's not in evidence.
> Judge: Sustain your objection. The jury will not consider the last statement.
> Commonwealth's Attorney: The clip is in evidence. You will have this clip back there. You examine it for yourselves. The clip is in evidence. There were six in it when the officers found it. There were two shots fired by everyone's account outside. The two shots that hit Greg McGowan.

The Appellant argues that in making this statement the Commonwealth's Attorney did not confine himself to the facts in evidence and improperly encouraged the jury to investigate the magazine's capacity. We disagree.

■ Counsel may make reasonable conclusions in closing arguments but their statements must have a basis in the evi-

*cert. denied* 534 U.S. 928, 122 S.Ct. 289, 151 L.Ed.2d 213 (2001) (holding that trial court's failure to conduct *Daubert* hearing sua sponte is not palpable error); *Collins v. Commonwealth*, 951 S.W.2d 569 (Ky.1997).

**31.** *Alexander v. Swearer*, 642 S.W.2d 896, 897 (Ky.1982).

**32.** KENTUCKY EVIDENCE HANDBOOK, supra note 24, § 6.15, at 290.

**33.** Richard N. Ernest, Forensic Ballistics Consultant, http://outzonebbs.net/gunlab/srv_ccept.shtml.

**34.** *Tharp v. Commonwealth*, 40 S.W.3d 356, 368 (Ky.2000), *cert. denied* 534 U.S. 928, 122 S.Ct. 289, 151 L.Ed.2d 213 (2001).

dence before the court.[35] Although there was no testimony about the magazine's capacity, the magazine and live rounds were introduced into evidence and the jury may examine the evidence.[36] From this evidence, the jury could likely determine the capacity of the magazine. Admittedly it would be better if the magazine's capacity was established during the trial, and we leave the parties to resolve the matter on retrial accordingly.

### IV. CONCLUSION

Because Appellant was denied a protection against burglary instruction, we reverse his Second–Degree Assault conviction and remand for a new trial.

All concur.

---

**35.** *Horton v. Herndon,* 254 Ky. 86, 70 S.W.2d 975, 977 (1934); *Couch v. Commonwealth,* 202 Ky. 677, ——, 261 S.W. 7, 9 (1924).

**36.** *Evans v. Commonwealth,* 230 Ky. 411, ——, 19 S.W.2d 1091, 1097 (1929) ("The defendant objected to the jury looking through these microscopes at these bullets and shells, but we cannot see any well-founded reason for that. Suppose the bullet had been handed to the jury for their examination, there would be no well-founded reason for objecting. Such has been done hundreds of times. Now suppose that one member of the jury had put on his spectacles in order he might see the bullet better, no objection could be made to that; yet, when he looks through the microscope, the defendant objects. That is just the same as the use of the spectacles. It merely enabled the juror to see and to see better than he could see with his naked eye. So there is no well-founded reason for the defendant's objection.").