# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS
OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR
CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN
UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A
COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG
WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO
THE  ACTION.

RENDERED: JANUARY 18, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0278-MR

JORDAN G. ALFORD                                              APPELLANT

                      ON APPEAL FROM SIMPSON CIRCUIT COURT
v.                     HONORABLE MARK A. THURMOND, JUDGE
                                 NO. 18-CR-00305

COMMONWEALTH OF KENTUCKY                        APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Following a jury trial, Jordan Alford was found guilty of wanton murder by a Simpson County jury and sentenced to twenty years' by the trial court in accordance with the jury's recommendation. Alford now appeals his murder conviction as a matter of right, asserting errors regarding: (a) the exclusion of certain "state of mind" evidence; (b) improper opinion testimony by an investigating detective; (c) jury instructions allowing for rejection of his self-protection defense if Alford was the "initial aggressor;" (d) the refusal of the trial court to give a missing evidence instruction; and (e) the denial of Alford's motion for a directed verdict. Lastly, Alford argues that this Court should determine that he was immune from prosecution based upon our Commonwealth's self-defense statutes. Finding none of his contentions meritorious, we affirm his conviction and sentence.

## I. FACTUAL AND PROCEDURAL HISTORY

Damian Cook was nineteen years old when he was beaten to death by Alford. Alford admitted striking Cook, but it was disputed whether Alford acted in self-defense or to intimidate or enact revenge on Cook based on threats Cook made to Alexis Olliphant and Willa Jean Davenport.

For three weeks, Cook had been living in a garage in a trailer park in Franklin, Kentucky that belonged to the mother of a friend. His friend's mother had allowed him to stay there after Cook's own mother had "put [him] out on the street."

Olliphant testified extensively about her interactions with Cook. She explained that Cook had been her friend but had gotten "back on drugs." She heard that Cook had told people he was responsible for breaking into the trailer she shared with her boyfriend, and he had taken their money, a watch, a marijuana plant, and her boyfriend's car.

During the late evening of August 6, 2018, Olliphant and her boyfriend went out on the streets of their trailer park looking to confront Cook. When they found him, Olliphant put him in a chokehold while her boyfriend hit him repeatedly while wearing mixed martial arts (MMA) gloves. Following this assault, Olliphant immediately started taunting Cook on Facebook messenger with offensive language inviting Cook to come to her residence for another confrontation. Cook ignored both the early messages and a phone call made by Olliphant but finally started to respond with threats including stating he had "30 rounds" implying he had a firearm he would use and messaged a picture of

2

himself in dark clothes, a hood and a bandana over his face. Olliphant decided to tell her roommate Davenport about these threats. Davenport in turn called her uncle Alford and spoke to him about what was happening. The next day, August 7, 2018, Alford and his sister Amie Alford (who is Davenport's mother), drove from Tennessee to Franklin, Kentucky.

Olliphant testified that after Amie and Alford arrived, she showed them the threatening messages from Cook and Amie and Alford armed themselves with a stick and a bat from their car's trunk. Olliphant further testified that the three women (Olliphant, Davenport and Amie) together with Alford walked to the garage where Cook was living but that she stayed up on the roadside with Davenport while Amie and Alford went down the driveway to Cook's garage. Olliphant did not hear any dialogue and did not see Cook. She did however hear "two loud thuds."

Davenport testified that after Alford and Amie arrived at the mobile home park, they discussed the messages Olliphant had received from Cook. Afterwards, Alford was approached by a neighbor, Jimmy Hoskins, who spoke with him. According to Davenport, Alford only knew Cook based on pictures and messages that Olliphant showed Alford on her phone. According to Davenport, Amie grabbed a "tire thumper" from her car's back seat and Alford had taken "a stick" from the trunk prior to being given a bat by Hoskins. At the garage where Cook was living, Amie told Davenport and Olliphant to stay on the road while she and Alford went towards the garage. Alford entered the garage and Davenport stated that she could see Alford raise his arm, she heard

3

but did not see two strikes. After leaving the garage, Davenport testified that Alford said, "I've been hit like that a few times and pulled through" and gave the bat back to Hoskins.

Amie testified that Alford had informed her that Davenport and Olliphant had been trying to reach her, they were being threatened by a neighbor in their trailer park and Alford volunteered to go with her to Kentucky since he did not want her going alone. Upon arriving in Kentucky, Amie found the two young women to be distraught, stating they had been up all night in fear over the messages. After Olliphant and Davenport pointed out the garage where Cook was staying, Amie testified she told the young women to stay on the road. According to Amie, the entrance to the garage was open wide enough for someone to walk through; Alford went in first and told Amie to wait outside because Cook might have a firearm. Amie stated she heard Alford tell Cook that he had "f----ed with the wrong family." Amie explained that she then went inside the garage and saw Alford swing at Cook but did not see him strike Cook because of where Alford was standing. She admitted that she struck Cook in the leg while he was seated on a sofa and knocked a stereo off a table. While walking back, Alford told Amie "I got him good a couple of times." When questioned regarding seeing a knife, that was later photographed at the scene by police, Amie testified that she had not seen one.

Alford in turn testified that while he had looked at Cook's Facebook page, he had never met Cook and knew nothing of him other than what he was told by Olliphant, Davenport and Hoskins. According to Alford, Hoskins told him

4

that Cook was known for having a knife or a gun on him and gave him the bat to defend himself. Based upon what he knew at the time, Alford testified he believed he would be in danger when he met with Cook, but he did not intend to harm Cook.

Alford explained that when he arrived at Cook's garage, Cook was seated on a couch and Cook "waved him in." Alford testified that after he asked Cook to stop intimidating his family and stealing from them, Cook lunged off the couch at Alford with a knife trying to kill him. In response, Alford struck Cook with the bat. Alford did not believe he had hit Cook very hard and Cook didn't fall to the ground but sat back on the couch. After leaving Cook's, Alford testified he returned the bat to Hoskins.

None of these four participants contacted the police, called for medical assistance, or went back to check on Cook's condition. Amie and Alford drove home to Tennessee. Approximately two hours later, two of Cook's neighbors found him on the floor of the garage. According to the men, Cook was breathing but unconscious and it looked like he had been "beaten half to death."

Detective Amos investigated the circumstances surrounding Cook's death and personally observed the position of Cook's body in the garage and the location of Cook's wounds before Cook was transported to the hospital. He later attended Cook's autopsy.

External signs of Cook's injuries included a large hematoma that projected out approximately three inches from his skull and another on the right side of the crown of his skull. Cook was transported to the Franklin

Medical Center and then flown to a trauma center in Nashville, but he never regained consciousness. In Nashville he was pronounced brain dead and life support was subsequently withdrawn on August 11, 2018. Cook's autopsy showed a centerline skull fracture, orbital bone fracture, bleeding on the brain and herniation of the brain all resulting from blunt force injuries to the head.

Olliphant was charged with complicity to commit murder; she pled guilty to first-degree wanton endangerment and was sentenced to five years' imprisonment. Davenport was also charged with complicity to commit murder; she pled guilty to first-degree wanton endangerment and was sentenced to five years' imprisonment. Amie was charged with murder but eventually pled guilty to first-degree manslaughter and received a fifteen-year sentence.

A five-day jury trial on Alford's charges was conducted and concluded on March 15, 2022. The trial court instructed the jury on wanton murder and the lesser included crimes of second-degree manslaughter and reckless homicide. The trial court also instructed the jury on self-defense albeit with an "initial aggressor" qualification. The jury found Alford guilty of wanton murder.

During sentencing, the jury was provided with a sentencing range of twenty to fifty years', or life. The jury recommended a sentence of twenty years'. The Simpson Circuit Court sentenced Alford in accordance with this recommendation with credit for time served.

## II. LEGAL ANALYSIS

**A.     Did the trial court err by excluding certain "state of mind" evidence as hearsay? - Preserved**

Alford asserts that the trial court committed reversible error on two separate occasions by: (1) not allowing Alford to testify about what he had been told about Cook by Hoskins, the man who had allegedly given him the bat which he used to kill Cook; and, (2) not allowing him to admit a photograph from Cook's Facebook profile which showed him wearing a bandana around his face.

Alford argues that this evidence should have been admitted as it went to his state of mind and, given his claim of self-defense, he should have been allowed to fully establish the basis for his fear of Cook and the reasonableness of his actions. Prior to confronting him, the only things Alford knew about Cook were what he had been told by others including Hoskins, the messages shown to him, and, allegedly, the photograph on Cook's Facebook profile.

**1.     Did the trial court err by excluding Alford's testimony restating what he had allegedly been told by Hoskins? - Preserved**

Alford was not able to call Hoskins as a witness as he died prior to the trial. Therefore, Alford was the only one who could testify about the warnings he received from Hoskins about Cook.

Alford testified that Hoskins had stated to him, "[l]ook man you should probably take something with you," that "[Cook] has been known to have a knife or a gun, he is known to have a weapon on him," and "[y]ou [Alford] should probably take something with you."

The Commonwealth objected to Alford's obvious hearsay testimony, and the trial court admonished the jury to disregard it. The trial court ruled that Hoskins's statements could only come in under Kentucky Rules of Evidence (KRE) 803(3) to show the declarant's (Hoskin's) state of mind but that Alford *could* testify to his own state of mind, and why he believed what he did, without restating the hearsay statements made by Hoskins.

While Alford is correct that the impression Hoskins's statements made upon him may have helped form his opinion of Cook and made him fearful of Cook, therefore making this hearsay conversation relevant to his defense of self-preservation, we do not need to analyze the hearsay statements in that context since, in this instance, there was ultimately no prejudice to Alford.

The trial court allowed Alford to testify on direct that, based on his conversation with Hoskins concerning Cook, Alford believed he needed a weapon to defend himself. Additionally, while being cross-examined by the Commonwealth, Alford testified that Hoskins told him he should probably take something for protection, handed Alford the bat, and told him he should take it to protect himself from Cook. Following Alford's written motion for a new trial which contained this present argument, the trial court determined that given the abundance of subsequent testimony that Alford provided to the jury regarding what Hoskins had told him, and how he reacted to such information, the issue of the original hearsay ruling and admonishment had become moot. After considering Alford's testimony, we agree that any error by the trial court in precluding Alford's hearsay testimony was harmless.

8

## 2. Did the trial court err in excluding a photograph of Cook which Alford alleged to have viewed on Cook's Facebook profile? - Preserved

At trial, Alford attempted to introduce a photograph of Cook found on Cook's Facebook profile, which showed Cook wearing a bandana as a mask. The Commonwealth objected on the basis that this photograph was hearsay. Alford explained that because he had not met Cook earlier, he looked him up on Facebook while he and his sister were traveling to Kentucky. Alford argued he was not offering the photograph for the truth of the matter asserted but for the fact that Cook was wearing the bandana as a mask, which confirmed Olliphant and Davenport's statements that he wore a mask, thus giving Alford a basis for believing they were telling the truth. Alford also argued that Cook's "demeanor and his pictures caused [Alford] concern."

The trial court ruled that the photograph constituted hearsay evidence and for it to come in, the photograph would have to be reflective of the declarant's (Cook's) state of mind, not the listener's (Alford's) pursuant to KRE 803(3). Determining that the photograph was not pertinent to Cook's state of mind, the trial court excluded its admission.

Alford now argues that the admission of the Facebook photograph would have allowed the jury to infer: Alford should have reasonably been in fear of Cook; Cook was prone to violence; Cook was armed; and/or Cook was more likely to have been the initial aggressor necessitating Alford striking him in self-defense.

9

Online social media has become an ever-present fact of life in contemporary society serving to record, accurately or not, both everyday activities and tragic events. As such, it can be a treasure trove of evidence for use in both criminal and civil proceedings.

We must address this Facebook photograph in two ways, considering the content of the photograph itself and as a piece of digital media associated with Cook by being on his Facebook profile. For the latter issue, we must first discern the photograph's relevancy and then give consideration to its authenticity.

### a. Should the photograph have been admitted?

We initially consider whether the trial court was correct to determine that the photograph constituted hearsay. Hearsay is defined in KRE 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(a) defines statements as being: "(1) An oral or written assertion; or (2) Nonverbal conduct of a person, if it is intended by the person as an assertion."

Photographs are generally not hearsay since they usually do not contain or represent a "statement" or "assertion," but instead are the memorialization of a particular moment in time.

The next consideration is whether the photograph could properly be admitted based on Alford's justifications, that it was relevant for understanding his state of mind when he confronted Cook and helped to justify Alford's

10

actions. Evidence is admissible only if it is relevant. KRE 402. Evidence is

relevant if it is material and probative. KRE 401. It is material if it goes to a fact

of consequence in the case, and it is probative if it tends to make a matter of

fact even marginally more or less likely. *Id.* Furthermore, the standard for

admission of evidence is only whether it makes a relevant issue more or less

probable, not whether it compels a conclusion. *Bush v. Commonwealth,* 839

S.W.2d 550, 557-58 (Ky. 1992).

We have addressed these issues in specific regard to self-defense

matters.

> "In self-defense cases, fear by the defendant of the victim is an element of the defense and can be proved by evidence of violent acts of the victim, threats by the victim, and even hearsay statements about such threats, provided that the defendant knew of such acts, threats, or statements at the time of the encounter." Robert G. Lawson, *The Kentucky Evidence Law Handbook,* § 2.15[4][d] (4th ed. 2003). Such evidence is admissible because it is not offered to prove the victim's character or to show action in conformity therewith, but to prove the defendant's state of mind— his fear of the victim—at the time he acted in self-defense. *Saylor v. Commonwealth,* 144 S.W.3d 812, 816 (Ky. 2004).

*Ordway v. Commonwealth,* 391 S.W.3d 762, 779 (Ky. 2013) (footnote omitted).

The photograph's effect on Alford is a valid consideration as it supported

his impression, mistaken or not, that Cook could be a threat and added

credence to his impression that Olliphant and Davenport were being truthful

about the threat that Cook posed. This provided context for Alford's later

encounter with Cook and could have contributed to the lens through which

Alford viewed Cook. The trial court erred in not allowing the admission of the

11

photograph on hearsay grounds as it was not hearsay and was otherwise both relevant and probative.

If the photograph's content had been properly deemed admissible, the next hurdle would have been a determination of whether the photograph was actually Cook's. To do that, material posted to social media must be properly authenticated.[1]

### b. How should a social media photograph properly be authenticated prior to admission?

The next area of inquiry is the ability of the trial court to reliably authenticate what is being proffered. Meaning, is the item presented (as originally found online) actually what the party claims it is?

Traditional authentication rules apply to Facebook posts, whether such posts consist of a profile page entry, message, photograph or video.

Under KRE 901, a document must be authenticated before it can be admitted into evidence. While the proponent's burden is slight, it is nonetheless real and requires a showing "sufficient to support a finding that the matter in question is what its proponent claims." KRE 901(a); *Johnson v. Commonwealth*, 134 S.W.3d 563 (Ky. 2004).

In our pre-internet opinion in *Beason v. Commonwealth*, 548 S.W.2d 835, 837 (Ky. 1977) (quoting 2 *McCormick on Evid.* § 212, 527 (1972)), we held

---

[1] In the context of this case, unless there was a claim that the photograph was not publicly accessible on Facebook, the necessity of authenticating the photograph would be limited. Alford's alleged subjective fears did not depend on the photograph's authenticity, only on its existence and how it depicted Cook.

"[i]f the offered item possesses characteristics which are fairly unique and readily identifiable and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit merely on the basis of testimony that the item is the one in question and is in a substantially unchanged condition." However, if the offered evidence "is of such a nature . . . to be susceptible to alteration by tampering or contamination, sound exercise of the trial court's discretion may require a substantially more elaborate foundation." *Id.* (quoting 2 *McCormick on Evid.* § 212, at 527 (1972)).

These principles still hold and as we have stated "are perhaps *stronger* today, in light of technological advancements." *Brafman v. Commonwealth*, 612 S.W.3d 850, 866–67 n. 67 (Ky. 2020). In *Brafman* we stated that "[t]rial courts must understand how easy it is for anyone to present themselves as someone they are not on social media, in anonymous online forums, or through cell phone communication, or to use such technology to manufacture a profile in someone else's name" and "texts and chats can be selectively solicited or deleted by the recipient at will." *Id.*

Such concerns become even more imperative given the constant advancement and ubiquity of software which now allows the most unsophisticated of users to manipulate images with professional-quality results. The emergence of artificial intelligence, with the capacity and initiative to manipulate digital images—without user input—will only serve to further

13

compromise our determinations of authenticity unless such advancements are both recognized and addressed by our courts.

When it comes to materials found on the web, one commentary on Federal Rules of Evidence 901, which essentially mirrors our own KRE 901, suggests:

> To authenticate a printout of a web page, the proponent must offer evidence that: (1) the printout accurately reflects the computer image of the web page as of a specified date; (2) the website where the posting appears is owned or controlled by a particular person or entity; and (3) the authorship of the web posting is reasonably attributable to that person or entity. Evidence that may corroborate these points could include testimony of others who saw the posting on the website, continuation of the posting on the website so that it is available to be seen by the court, or evidence that the party to whom the posting is attributed made similar postings or published the same information elsewhere."

Christopher B. Mueller and Laird C. Kirkpatrick, 5 *Federal Evidence* § 9:9 (4th ed.) (updated May 2014).

While it does not appear that either the trial court or the Commonwealth questioned whether or not the Facebook profile photograph of Cook was authentic, care must be taken when a court is faced with items which allegedly were taken from the internet.

### c. The error in excluding the photograph was harmless as it was cumulative of other admitted evidence

The photograph, if properly authenticated as existing online and being viewed by Alford, should have been admitted not for any message it may have communicated, but for the effect the photograph had upon Alford. The photograph should have been considered relevant given Alford's testimony that he acted in self-defense and his viewing of the arguably threatening photograph

14

occurred in proximate time to his encounter with Cook. However, even assuming Alford could have, if given opportunity, properly authenticated the photograph as being online and available to viewing by him, we can still not find reason to set aside his verdict because the photograph was cumulative.

Regarding the issue before the jury of Alford's alleged fear of Cook, and his apprehension at confronting him, any error by the trial court in refusing to allow the Facebook profile photograph was harmless. Alford was able to put on his full theory of defense: Davenport and Olliphant were in fear of Cook, Cook had sent messages and a photograph that Olliphant found threatening, Alford was apprehensive of meeting Cook because of what Davenport, Olliphant *and* Hoskins had told him, Alford had feared Cook based upon what he saw on Cook's Facebook profile, Hoskins was the source of the bat used by Alford, and Alford had reason to believe Cook was possibly armed. Even without placing Cook's Facebook profile into evidence, Alford was able to testify that his viewing of the profile made him apprehensive of Cook.

In sum, while the trial court erred in excluding the photograph as hearsay when it should have appropriately been admitted for its effect on Alford, the excluded evidence was cumulative, and its exclusion was not so prejudicial to Alford as to necessitate a retrial.

**B.      Did the trial court err by allowing a detective to testify regarding matters where he was not qualified to give an opinion? - Partially Preserved**

Alford next claims that on four separate occasions, Detective Amos gave impermissible testimony when he: (1) opined that Cook was sitting when

struck; (2) opined Olliphant's boyfriend could not have struck the fatal blow while wearing MMA gloves; (3) described what defensive wounds are; and (4) answered hypotheticals involving when self-defense was appropriate.

In the first instance, the Commonwealth asked the investigating detective if, "based on your training and experience would Jordan Alford be able to strike [Cook] on the top of his head while he was standing?" Alford's counsel objected that this called for expert testimony. The trial court overruled the objection but asked that a foundation be laid. Detective Amos was asked if he had any training where he "would be able to determine where someone would strike somebody else based upon their heights?" Detective Amos responded in the affirmative and stated that he had at the police academy during baton training. Alford did not renew his objection, nor did he ask for a *Daubert*[2] hearing.

The Commonwealth then restated his initial question and asked "based on your training and experience, and looking at this investigation would [Alford] be able to strike [Cook] on the top of his head while [Cook] was standing?" Detective Amos answered, "no."

KRE 702 "permit[s] opinion evidence from experts providing 'scientific, technical, or other specialized knowledge' if it will 'assist the trier of fact' in understanding the evidence or determining a fact in issue." *Gray v. Commonwealth,* 480 S.W.3d 253, 269 (Ky. 2016). In order to testify as an

---

[2] *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993)

16

expert, "a witness [must be] qualified as an expert by knowledge, skill, experience, training, or education[.]" KRE 702.

In *Alexander v. Swearer,* 642 S.W.2d 896, 897 (Ky. 1982), we said that "[e]ssential fairness in a trial requires that the trial court carefully scrutinize the qualifications and the testimony of the officer before permitting his opinion testimony to be submitted to a jury[,]" and in this instance we are satisfied here that Detective Amos's qualifications and personal observations were sufficient to allow him to testify as to what he believed were the relative positions of the two parties at the time Cook was struck based upon what he saw regarding the position of Cook's body, the location of Cook's head wounds, and the relative heights of Alford and Cook. Furthermore, such testimony falls more towards general lay testimony where a witness would understand what wounds can be inflicted based on whether the person is sitting or standing. Even were we to determine that Detective Amos's testimony in this area had been expert evidence, the trial court was not requested to hold a *Daubert* hearing before the testimony was admitted and such was not required here.[3]

Next, the trial court also overruled Alford's objection that there was a lack of foundation to Detective Amos testifying that he did not believe the MMA

---

[3] *See City of Owensboro v. Adams,* 136 S.W.3d 446, 451 n.1 (Ky. 2004) ("Nevertheless, a court need not always hold a *Daubert* hearing even when the evidence is offered in a jury trial, *Clay v. Ford Motor Co.,* 215 F.3d 663, 667 (6th Cir. 2000), though it should do so when admissibility is not obvious from the record. *Commonwealth v. Christie,* Ky., 98 S.W.3d 485, 488 (2002)."); *Tharp v. Commonwealth,* 40 S.W.3d 356, 367-68 (Ky. 2000) (holding that trial court's failure to conduct *Daubert* hearing *sua sponte* is not palpable error).

gloves worn by Olliphant's boyfriend—when he had previously assaulted Cook—could have caused Cook's fatal injuries.

The Commonwealth argues that the detective's opinions were admissible because each was rationally based upon his own perceptions drawn from his personal investigation of the crime. Alford argues that Detective Amos was not qualified to give his opinions on matters actually falling under KRE 702.

However, in this instance we determine that Detective Amos's testimony as to whether the MMA gloves worn by Olliphant's boyfriend could have caused Cook's ultimately fatal injuries would more reasonably fall under the detective's generalized capacity to testify. "The degree to which a witness may give an opinion, of course, is predicated in part upon whether and the extent to which the witness has sufficient life experiences that would permit making a judgment as to the matter involved." *Mondie v. Commonwealth,* 158 S.W.3d 203, 212 (Ky. 2005) (citing Richard H. Underwood & Glen Weissenberger, *Kentucky Evidence 2004 Courtroom Manual* 343 n. 24 (Anderson Publishing Co. 2003).

Alford presented no testimony and no evidence whatsoever that Olliphant's boyfriend's act of hitting Cook while wearing padded MMA gloves, the day before Alford repeatedly struck Cook in the head with a bat, could have been the actual cause of the horrific head injuries or the brain injuries that resulted in Cook's death. There was no issue presented in this matter as to who, or what instrument, caused Cook's death and we will not entertain such new notions on appeal.

18

Next, Alford argues that it was improper for the trial court to allow the detective to offer testimony regarding defensive wounds. On direct examination, the Commonwealth asked Detective Amos what defensive wounds were to which Alford's counsel objected stating that a foundation based on his training would first need to be laid. The trial court overruled the objection and Detective Amos testified that defensive wounds were wounds someone could sustain if they were being attacked and stuck their hands up to stop the attack resulting in injuries to their hands or arms. Detective Amos further testified that when he attended Cook's autopsy, he saw no defensive injuries. No objection was made to the detective's testimony as to whether he observed defensive wounds on Cook's body.

We find no error in the trial court allowing the detective's limited testimony regarding what constitutes defensive wounds and further find no error in Detective Amos testifying whether Cook's body showeds signs of defensive wounds. Both of these areas of inquiry fall readily within the training, experience, and personal observations of this detective and no further qualifications were necessary.

Lastly, Alford argues that Detective Amos's opinions in response to hypothetical questions posed regarding self-defense were improper. On re-direct, the Commonwealth asked the detective, "[i]f someone comes into the homeowner's home, one with a baseball bat and the other with a stick or some sort of wooden object, would, in that scenario, would the homeowner have the right to protect themselves?" No objection was made by Alford and the detective

19

agreed the homeowner would have that right. The Commonwealth then asked, "[i]f the homeowner had protected themselves in that situation would the attacker have a right to self-defense?" At this juncture Alford's counsel did object stating the Commonwealth was getting "off" and was venturing into "legal stuff." The trial court overruled this objection because Alford's own counsel had been allowed to ask similar types of questions regarding self-defense on cross examination. The detective went on to answer that if an armed attacker were in a homeowner's house and the homeowner was defending himself, "then the attacker would not have the self-defense right."

We agree with the trial court that Alford "opened the door" to this line of questioning by the Commonwealth when his own counsel asked the detective hypothetical questions during cross-examination about self-defense including regarding a scenario where one person was lunging at another with a knife. *See Commonwealth v. Stone,* 291 S.W.3d 696, 701-02 (Ky. 2009).

On appeal, Alford argues that Detective Amos's testimony constituted legal opinions which invaded the province of the jury. That is true and we do find the entire line of questioning, by both Alford and the Commonwealth, to have been inappropriate and unnecessary to the jury's understanding of the issues or the law in our Commonwealth. It is not the province of law enforcement officers to inform the jury as to what our laws are or how they are to be applied. *Tamme v. Commonwealth,* 973 S.W.2d 13, 32 (Ky. 1998).

We note that the jury was correctly instructed by the trial court regarding the right to self-defense, the detective's opinions regarding the right

20

to self-defense, although abridged, were not inconsistent with our law or the instructions given to the jury, and the detective's cursory responses to the hypothetical questions posed did not indicate that Alford was guilty or that the detective had himself determined Alford to be guilty.

While it would have been proper to exclude the detective's hypothetical testimony regarding what actions constitute either lawful or unlawful self-defense, we may confidently determine here that neither the questioning nor the detective's responses substantially swayed the jury's judgment in this matter and we are satisfied that the error was harmless. *Winstead v. Commonwealth,* 283 S.W.3d 678, 688-89 (Ky. 2009).

## C.    **Did the trial court erroneously instruct the jury? - Preserved**

Alford argues that the trial court erred by giving the jury an instruction, in addition to a self-defense instruction, which allowed for the jury to reject his defense by finding him the initial aggressor. In this case, the trial court instructed the jury on the allowable defense of self-protection in accord with KRS 503.050 but added the initial aggressor qualification found in KRS 503.060(3) which states:

> Notwithstanding the provisions of KRS 503.050, the use of physical force by a defendant upon another person is not justifiable when:
>
> (3) The defendant was the initial aggressor, except that his use of physical force upon the other person under this circumstance is justifiable when:
>
>> (a) His initial physical force was nondeadly and the force returned by the other is such that he believes himself to be in imminent danger of death or serious physical injury; or

21

(b) He withdraws from the encounter and effectively communicates to the other person his intent to do so and the latter nevertheless continues or threatens the use of unlawful physical force.

"Instructions must be based upon the evidence and they must properly and intelligibly state the law." *Howard v. Commonwealth*, 618 S.W.2d 177, 178 (Ky. 1981). "When the question is whether a trial court erred by: (1) giving an instruction that was not supported by the evidence; or (2) not giving an instruction that was required by the evidence; the appropriate standard for appellate review is whether the trial court abused its discretion." *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015), *overruled on other grounds by Univ. Med. Ctr., Inc. v. Shwab*, 628 S.W.3d 112 (Ky. 2021). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Alford cites to our opinion in *Conley v. Commonwealth*, 599 S.W.3d 756 (Ky. 2019), for the proposition that the initial aggressor instruction should not have been given because there was no evidence presented at trial that Alford was an initial aggressor. In *Conley*, unlike in this case, there was simply no evidence, circumstantial or otherwise, of the defendant being an initial aggressor.

In *Stepp v. Commonwealth*, 608 S.W.2d 371 (Ky. 1980), this Court decided that in determining whether a limitation to a self-defense instruction is

22

proper, the trial court must consider the circumstances surrounding the incident as a whole:

> It is not every assertion of such belief that is adequate to support a plea of self-defense. It is the whole circumstances which surround the incident that must be considered by the trial judge in deciding whether an instruction on self-defense is proper or whether an instruction on self-defense with limitations is proper. We have held that before such qualifying instructions are proper there must of course be evidence to justify it. In other words, the trial judge must find as a matter of law that there is sufficient evidence to justify such limitations before instructing the jury.

*Id.* at 374 (citing Mayfield v. Commonwealth, 479, S.W.2d 578 (Ky. 1972); Crigger v. Commonwealth, 225 S.W.2d 113 (Ky. 1949)).

For a defendant to be the initial aggressor, the defendant must use physical force prior to any act of purported self-protection. KRS 503.060(3)(a). Alford claims the Commonwealth presented no evidence that he used physical force on Cook prior to Cook, allegedly, lunging towards him with a knife, and therefore there was no evidence to support giving a limiting initial aggressor instruction. We disagree. It is undisputed that Alford armed himself prior to his meeting with Cook and approached the garage, without any advance notice to Cook, intending to confront him. Alford never mentioned being assaulted by Cook at the scene of the incident. The only evidence of Cook lunging at Alford came from Alford's own testimony. There was ample evidence from which a jury could, and ultimately did, determine that Alford was not acting in self-defense and was the initial aggressor when he repeatedly struck Cook. Therefore, the trial court did not act erroneously in providing the qualifying instruction.

23

**D.     Did the trial court err in denying Alford a missing evidence instruction regarding a knife found at the scene? - Preserved**

Alford tendered a "missing evidence" instruction to the trial court relative to a knife which had been photographed at the scene, but which was not collected by law enforcement. Generally, we review a trial court's decision to provide certain jury instructions under an abuse of discretion standard and reverse only if its decision is arbitrary, unreasonable, unfair or unsupported by sound legal principals. *Downs v. Commonwealth*, 620 S.W.3d 604 (Ky. 2020).

The knife in question was a large folding knife that, rather uniquely, had a blade which was longer than the grip into which the blade folded. Therefore, the knife, even when folded as this one was, would be dangerous and able to stab a person up to the area of the blade which was not encased in the handle.

A paramedic witnessed Cook on the ground beside his sofa and found the folded knife under Cook when he was rolled onto a backboard. A trooper later photographed the knife and noted its presence in a report but did not collect it into evidence. At trial, the trooper explained that if there was no evidence an item had been used in a crime, it would not be collected.  At the time of his investigation, there was only a badly beaten victim and Alford had yet to allege that he had defended himself from a knife attack. The lead detective in this case also testified that law enforcement would have been looking for a weapon that could have caused Cook's injuries, not a knife or a gun, since Cook had only blunt force wounds.

Despite not having the knife to show the jury, Alford was able to introduce two separate photographs of the knife taken at the scene.

24

Alford sought a lost or destroyed evidence instruction which stated:

> If you find that law enforcement intentionally failed to preserve the knife, as seen in the Defendants Exhibit "F", as evidence in this case, or that law enforcement knew or should have known that it could have been evidence in this case, you may infer, but are not required to infer, that this evidence was unfavorable to the Commonwealth and favorable to the Defendant.

The trial court rejected the instruction believing that law enforcement may have been negligent but did not exhibit bad faith and noted the jury was able to view photographs of the knife in the context of Alford's testimony.

Following Alford's conviction, he made a motion for a new trial, adding to his argument that he lost the opportunity to have the knife tested for DNA or fingerprints.

We only find a due process violation regarding missing or destroyed evidence when "evidence was intentionally destroyed by the Commonwealth or destroyed inadvertently outside normal practices". *Estep v. Commonwealth*, 64 S.W.3d 805, 809 (Ky. 2002) (citing Tamme v. Commonwealth, 579 S.W.2d 51, 54 (Ky. 1988)). Accordingly, a failure to preserve potentially useful evidence does not rise to a violation of due process absent a showing that law enforcement acted in bad faith. *Collins v. Commonwealth*, 951 S.W.2d 569, 572 (Ky. 1997).

On appeal, Alford recognizes our precedent but argues that this standard is too stringent and the alleged negligence of law enforcement in failing to secure and preserve the knife "critically prejudiced" him. There very well could be instances where negligent police investigation, and their failure to secure

25

obvious or relevant evidence, could work just such an injustice to a defendant as to require either a missing evidence instruction or reversal. However, due process does not require such an outcome here.

The knife was photographed, those photographs were seen by the jury, and Alford was able to show that the knife was dangerous even while folded. It was also acknowledged that the knife was in close proximity to Cook, under his body, when he was found, giving ample credence to Alford's testimony that Cook had it in his hand and later collapsed onto the knife after being struck by Alford. Since there was no testimony questioning who owned the knife, and no testimony that either Alford or Amie possessed a knife when they entered Cook's garage, there was no reason to presume the knife belonged to anyone other than Cook. Furthermore, to the extent that law enforcement was negligent in not securing the knife, such negligence was practically invited by Alford since he neither summoned medical assistance nor informed law enforcement that Cook had lunged at him with a knife and initiated their melee. Under the circumstances, the trial court did not commit an abuse of discretion in refusing to provide the instruction.

**E.      Was Alford entitled to a directed verdict? - Preserved.**

Alford argues that the trial court erred when it denied his motion for a directed verdict as to the wanton murder charge alleging that "a reasonable juror could not conclude beyond a reasonable doubt that Alford was the initial aggressor and attacked Cook for a purpose rather than acting out of fear for his life."

26

In considering whether a motion for directed verdict should be granted, "[t]he trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be given unless the evidence is insufficient to sustain a conviction." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983).

As stated in *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991):

> If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

On appeal, the denial of a directed verdict motion is reviewed to determine whether "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then is the defendant is entitled to a directed verdict of acquittal." *Lamb v. Commonwealth*, 510 S.W.3d 316, 325 (Ky. 2017) (quoting *Benham*, 816 S.W.2d at 187).

KRS 507.020(1)(b) provides in relevant part that a person is guilty of wanton murder when: "[U]nder circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person."

The jury was further properly instructed that to engage in wanton conduct, one must be aware of and consciously disregard "a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a

27

gross deviation from the standard of conduct that a reasonable person would observe in the situation." KRS 501.020(3).

A wanton mental state alone is not enough to justify a conviction under KRS 507.020(1)(b) for wanton murder, as evidence of further circumstances manifesting extreme indifference to human life must accompany an actor's wantonness. *Brown v. Commonwealth,* 174 S.W.3d 421, 425 (Ky. 2005). This element has been described as "aggravated wantonness." *Graves v. Commonwealth,* 17 S.W.3d 858, 863 (Ky. 2000).

The jury here could infer Alford's intent "from the act itself or from the circumstances surrounding it." *Talbott v. Commonwealth,* 968 S.W.2d 76, 86 (Ky. 1998). Alford was also "presumed to intend the logical and probable consequences of his conduct," and his intent could also be inferred from his actions preceding and following the charged offense. *Stopher v. Commonwealth,* 57 S.W.3d 787, 802 (Ky. 2001). Based upon the evidence presented, including Alford's own testimony, we cannot say that the jury was unreasonable in concluding that Alford's conduct manifested an extreme indifference to human life. The Commonwealth produced ample evidence of substance proving that Alford sought out Cook while armed with a bat, struck Cook at least twice in the head with the bat, and then left him unattended and unaided while his brain swelled from the blows ultimately resulting in his death. Alford disregarded the grave risk of injury or death associated with his actions, and we find that the trial court did not err in denying Alford's motion for a directed verdict on wanton murder.

**F.     Was Alford entitled to statutory immunity? - Unpreserved**

Lastly, Alford argues that he is entitled to immunity from criminal liability under our Commonwealth's self-protection statutes. This error is unpreserved and Alford therefore requests palpable error review which would require that this Court find the error resulted in manifest injustice.

Alford asserts that he "subjectively believed that his life was in danger" and cites to *Hatcher v. Commonwealth*, 310 S.W.3d 691, 700 (Ky. App. 2010), for the proposition that "the doctrine of self-protection turns upon a defendant's subjective belief of the need to use force[.]"

According to Alford, "the totality of the circumstances and the 'probabilities' support the conclusion that [Alford] was placed in sudden mortal fear for himself, that he responded reasonably by using a bat in self-defense, considering the size of [Cook], his reputation for always having a knife or a gun, and the apparent threats of the knife before." In sum, Alford recounts the details of the defense he offered at trial and asks us to reject the Commonwealth's evidence and the jury's determination.

KRS 503.085 states in relevant part:

(1) A person who uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080 is justified in using such force and is immune from criminal prosecution and civil action for the use of such force, unless the person against whom the force was used is a peace officer, as defined in KRS 446.010, who was acting in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law, or the person using force knew or reasonably should have known that the person was a peace officer. As used in this subsection, the term "criminal prosecution" includes arresting, detaining in custody, and charging or prosecuting the defendant.

29

(2) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (1) of this section, but the agency may not arrest the person for using force unless it determines that there is probable cause that the force that was used was unlawful.

In *Commonwealth v. Lemons*, 437 S.W.3d 708, 715 (Ky. 2014), we subsequently determined that a *de novo* standard of review is not appropriate in a determination of probable cause in a self-defense/defense of others immunity case and instead would look to whether the trial court had a "substantial basis" for not dismissing the case, utilizing our probable cause standards which have been "defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *Id.* at 715. (quoting *Commonwealth v. Jones,* 217 S.W.3d 190, 200 (Ky. 2006)). The evidence of record herein was, to say the least, inconsistent and does not categorically lead to a determination that Alford acted in self-defense. Therefore, there was no error in the trial court failing to act on its own volition to dismiss the criminal action.

### III. CONCLUSION

We affirm Alford's conviction and his sentence by the Simpson Circuit Court.

All sitting. All concur.

30

COUNSEL FOR APPELLANT:

Kayley Barnes
Kathleen K. Schmidt
Assistant Public Advocates


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Kristin L. Condor
Assistant Solicitor General